# LISBON *v.* LYMAN.

Under Rev. Stat. ch. 65, sec. 1, which provides that "upon the division of any town, any person having his settlement therein, shall thereafter have his settlement in that town in which his last dwelling place shall have been," an emancipated minor may have a different dwelling place from that of his parents.

In deciding whether a minor was emancipated, the jury are not to take a legal presumption that minors are not emancipated, as an element of evidence to be weighed with the testimony.

When the payment of all taxes duly assessd, is an essential ingredient of a pauper settlement, the party affirming the settlement, has the burden of proof, and must show either that taxes were not assessed, or that taxes were paid.

This burden of proof is not changed by the subject-matter being peculiarly within the knowledge of the other party, or by the convenience or inconvenience of furnishing evidence.

The general principle, which, in the correction of errors, preserves, as far as possible, what is good, and destroys only what is erroneous, applies to trial by jury ; and a new trial is granted only of that part of a case, in the former trial of which there was error, or only of so much of the case as it is necessary to try in order to fairly correct the error.

ASSUMPSIT, for the support of the pauper wife and children of one Volney C——. Verdict for the plaintiff. Motion of the defendant for a new trial.

The question was whether Volney had a settlement in Lyman, by derivation from his father Isaac. Lyman was divided into the two towns of Lyman and Monroe, July 13, 1854. There was evidence tending to show that Isaac resided in Lyman from 1833 to 1851. Volney was born July 29, 1833 ; removed with his father in 1851 to the part of Lyman, which is now Monroe, where his father has ever since resided ; has been absent from his father's house most of the

time since 1852; was married in February, 1853; and in 1853 and in 1854, spent sometime in what is now Lyman.

The plaintiff relied upon Rev. St. ch. 65, sec. 1, which provides that " legitimate children shall have the settlement of their father, * * * until they gain a settlement of their own," and that, " upon the division of any town, any person having his settlement therein, shall thereafter have his settlement, in that town in which his last dwelling place shall have been." The jury were instructed that it was the presumption that unemancipated minors have the dwelling place of their parents, and cannot, so long as they remain unemancipated, have or acquire any other dwelling place, within the legal meaning of that term in the statute; and that, if Volney was not emancipated, his last dwelling place, before the division, was at his father's, in what is now Monroe, and their verdict must be for the defendant; but that an emancipated minor can have or acquire a different dwelling place from that of his parents; that it was a question of fact for the jury, whether Volney was emancipated before the division, and, if so, when, that " emancipated " meant " set free from the control of his father"; that there was a presumption that children under twenty-one are not emancipated, but the presumption was not conclusive, and the fact might be shown by proof, to be otherwise; but that in deciding what the fact was, the jury would take this presumption into account, as one element of evidence, and weigh it in connection with all the testimony; that emancipation, in law, was an agreement and understanding between father and son, that the son should be free from his father's control, and have the same rights, so far as his father is concerned, that he would have if twenty-one; and that such an agreement might be inferred or implied from circumstances; to which instructions the defendant excepted.

There was evidence tending to show that, for four years between 1833 and 1851, Isaac had real estate in Lyman, of the value of $150. There was no evidence that any taxes were assessed in Lyman during this time, nor that Isaac paid any taxes. The jury were instructed that taxation would not be presumed; and that it was unnecessary to consider whether he paid taxes, until it was proved that there were taxes to be paid; to which instructions the defendant excepted.

*Carpenter*, for the defendant.

I. Volney Clough, the father of the paupers being a minor at the time of the division of the town could not, even if emancipated, acquire a settlement under the 8th clause of sec. 1, ch. 65, Rev. Stats. which is as follows.

" Upon the division of any town, any person having his settlement therein, shall, thereafter, have his settlement in that town, in which his last dwelling place shall have been."

His settlement would therefore follow that of his father, by virtue of the second clause of the same section which is as follows :

"Legitimate children shall have the settlement of their father, if any he has within this state, otherwise the settlement of their mother if any she has, until they gain a settlement of their own."

The words "dwelling place" as used in the 8th clause have manifestly the same meaning as domicil or home. They are used as equivalent terms in the statute of 1828 on the same subject. Laws of 1830 p. 301, § 7. Also in the statute of 1796. Laws of 1815 p 363, § 7, and so in the same connection in the Mass. act of 1793. Mass. Rev. Stats. ch. 45, § 1 clause 10. They must be read here in the light of the familiar principle that the domicil of the minor child follows that of the father, as the domicil of the wife follows that of the husband. *Hart* v. *Lindsey*, 17 N. H. 235; Bouv. Law Dic. "Domicil" "Settlement;" Story's Conflict of Laws · § 46; 1 Greenl. 93; 3 Greenl. 239, 390; 3 D. & E. 114.

Certain general principles applicable to this subject of settlement are well established and uniformly recognized in this jurisdiction and elsewhere.

The settlement of paupers is fixed and regulated by the provisions of the statute upon the subject. No town is liable for the support of paupers by the common law, and no promise by any town for such support, can be implied. The obligation resting upon towns is wholly by virtue of the provisions of the statute. There is no obligation which, independantly of the statute, binds one town more than another to maintain a particular pauper. There are no equities, no moral considerations which can bear upon such a question. The sole enquiry in every case is whether the facts bring the particular town sought to be charged within the provisions of the statute.
*Mace* v. *Nottingham*, 1 N. H. 52; *Meredith* v. *Canterbury*, 3 N. H. 80; *Otis* v. *Strafford*, 10 N. H. 352; *Lisbon* v. *Bath*, 21 N. H. 319, 327–8 *French* v. *Benton*, 44 N. H. 28–32.

Statutes concerning paupers and the settlement of paupers must be construed strictly. A town in order to be charged with the settlement and support of a pauper must be brought clearly with the statutory provisions. *Meredith* v. *Canterbury*, 3 N. H. 80, 82; *Lisbon* v. *Bath*, 21 N. H. 319; "Much strictness" are the words used in the last cited case.

"It is by the provisions of statutes alone that paupers are supported. We have no common law authority upon the subject, and where a remedy is given by statute only, that statute must be strictly followed in order to receive its benefits; and hence the statutes upon this subject have been construed with a strictness not surpassed upon any other civil subject." Ibid p. 328. See also the authorities there cited as illustrating the doctrine.

It would seem to follow that in a suit brought to charge a town with the support of a pauper, if there be a serious doubt upon the construction of the statute as to whether the town is brought within the terms of the statute, the benefit of that doubt should be given to the town sought to be charged.

Should the result be as in some cases it might be that no town is found

chargeable in a particular case, the liability falls ultimately upon the county. Rev. Stats. ch. 61, §1, Gen. Stats. ch. 75, §1. To such result there can be no objection on grounds of general equity or expediency, but the contrary rather, as it tends to equalize the burden of pauperism and to make uniform the operation of the plans for its alleviation. This view seems to be in accord with the general tendency of legislation as well as of judicial decisions in recent years.

In support of this view we may advert to the principle laid down in Dwarris on Statutes p. 646,—these being statutes to impose public burdens.

" It is a general rule that when the public are to be charged with a burden, the intention of the legislature to impose that burden must be explicitly and distinctly shown."

Upon an examination of our statute of settlements, especially in the light of these general principles, no warrant can be found for the assumption that an emancipated, more than an unemancipated minor can gain a settlement in his own right. No sanction is given to such an idea by the terms or tenor of the statute, but the contrary is implied by both. Among the methods mentioned of gaining a settlement, this method is not mentioned, and the general principle that pauper settlements shall be gained solely by virtue of statute provisions strictly construed is made statutory by the following words in § 1, ch. 65, Rev. Sts. already cited.

" A legal settlement may be gained by any person, in any town, so as to oblige such town to support such person, if poor and unable to support himself, in the manner following, *and not otherwise.*"

In the 4th and 10th clauses of the section above cited, providing for the gaining of settlements by persons in their own right, the first by the holding of real or personal estate and paying taxes assessed thereon, the second by residence accompanied by the assessment and payment of taxes on the poll, it is expressly required that such persons shall be of the age of twenty-one years. These are the only parts of the statute which provide ways in which persons may acquire settlements in their own right. All the other methods presented are derivative. None of them cover this case, and it is not to be presumed that while the legislature guarded against the acquiring of settlements by emancipated minors, in either of the two ways just mentioned, it has enabled them, without length of residence, taxation, property or any other requisite to acquire settlements by the meer accident of their place of living at the moment of division of towns.

Adjudications in jurisdictions where settlements are regulated by statutes different from our own in the particular under consideration cannot govern this question. They may throw light upon it. *Granby* v. *Amherst*, 7 Mass, 1,–5, arose under the Mass. Statute of 1789. That statute, in the provisions for the acquisition of settlements by owning property and paying taxes thereon, and by residence and payment of poll taxes, had no requirement that the person should be twenty-one years of age, as did the statute of 1793. Stress is laid upon this circumstance in the opinion by C. J. Parsons. So

also in *St. George* v. *Deer Isle*, 3 Greenl. 390 ; (Maine was a part of Mass. till June 19, 1819).

In *Great Barrington* v. *Tyringham*, 18 Pick. 264, under the act of 1793 which did make majority a requisite, it was held that a minor deriving his settlement from his mother under that statute, residing in another state and employed in learning a trade, took a new settlement acquired by his mother, by a second marriage, before he came of age.

The whole matter of emancipation has, until recently, been left by our statute where it ought to be left, as a private arrangement to its effect upon the parties, creditors and others concerned therewith in business connection. It has had no operation upon municipal or other public relations. It does not capacitate a minor to acquire a settlement any more than it does to throw a vote or hold an office. It would lead to manifest inconveniences and confusion if it did. A father is under the same obligation to support his emancipated as his unemancipated minor child. See in this connection. *Abbott* v. *Converse*, 4 Allen 530.

The fact that the legislature at the last June session (Pamphlet Laws of 1868 ch. 1 § 16) found it necessary in order to effect the change in view, in the pauper laws, to enact that emancipated minors in certain specified cases only, should not take after acquired settlements of their parents, but should have the power to acquire settlements in their own right in such cases, goes to show the legislative understanding that in the absence of such a statute, they did not possess that power, but would take the settlement of their parents.

II.  Upon the question whether the verdict may be set aside in part only, we submit.

1.  It is not a matter of discretion in this court to set aside a verdict for erroneous rulings of the court at the trial term, either upon questions reserved, or upon a bill of exceptions. The party injured, being himself guilty of no laches, has a legal right to a new trial. Gen. Stat. ch. 189 ; *Wright* v. *Tatham*, 7 A. & E. 313, 330, Denman, C. J. ; *Rutzen* v. *Farr*, 4 A. & E. 53 ; *Bermasconi* v. *Fairbrother*, 3 B. & Ad. 372 ; *Mahoney* v. *Frazi*, 1 Dowl. P. C. 703 ; *Hutchinson* v. *Piper*, 4 Taunt. 555 ; *Tuttle* v. *Gates*, 11 Shep. (24 Me.) 395 ; *Wilson* v. *Rastall*, 4 T. R. 754 ; *Hudson* v. *Revett*, 5 Bing. 368, Best, C. J. ; *Tindal* v. *Brown*, 1 T. R. 164–171 ; *Blake* v. *Jones*, 3 E. L. & E. 559–562 ; *Herrick* v. *Storer*, 5 Wend. 580 ; *Stockdale* v. *Taste*, 4 A. & E. 1016, Denman, C. J.

Whence it follows that no terms (as costs, or that such and such facts shall not be contested) can be imposed as a condition of granting such new trial. *Senter* v. *Carr*, 15 N. H. 381 ; *Holland* v. *Seaver*, 21 N. H. 386 ; *Hodgdon* v. *Merrill*, 26 N. H. 17 ; *Lazear* v. *Costa*, 43 N. H. 82. See, also, *Edie* v. *East India Co.*, 2 Burr. 1216. If in any case, it is only where the granting of a new trial rests in the discretion of the court, (e. g. where it is moved on the ground of excessive or inadequate damages, as being against the

evidence or weight of evidence, and perhaps also for any cause founded merely upon the action and conduct of the jury,) that terms can be imposed and the trial restricted to a single point.  *Hutchinson* v. *Piper*, 4 Taunt. 555 ; *Thwaitis* v. *Sainsbury*, 7 Bing. 437 ; *Stroud* v. *Stroud*, 7 M. & G. 417 ; *Price* v. *Harris*, 10 Bing. 331 ; *Mahoney* v. *Frazi*, 1 Dowl. P. C. 703 ; (1 C. & M. 325 ; 3 Tyv. 264) *Macrow* v. *Hall*, 1 Burr. 11 ; *Farwell* v. *Chaffey*, do. 54 ; *Bright* v. *Enyon*, do. 390, Mansfield, C. J., & Foster, J. ; *Burton* v. *Thompson*, 2 Burr. 664 ; *Finch* v. *Brown*, 13 *Wend*. 601 ; *Tuttle* v. *Gates*, 11 Shep. (24 Me.) 395 ; *Smith* v. *Hosmer*, 7 N. H. 436–445 ; *Foster* v. *Alvez*, 3 Bing. N. C. 897, Vaughan, J.

I have not been able to find in the English books, nor indeed in any other except the Massachusetts Reports, a single case in which the scope of a new trial granted for error in the instructions of the court to the jury has been limited or restricted in any particular. The authorities above cited seem to be decisive that it cannot be, especially when it is considered that they are supported by the uniform practice of those courts.  The English cases are very numerous, in which verdicts have been wholly set aside ; though the error complained of affected only a single independent branch of the case, as e. g. the question of damages in the following cases : *Mahoney* v. *Frazi*, before cited ; *Rickman* v. *Carstairs*, 5 B. & Ad. 651 ; *Clement* v. *Lewis*, 3 Brod. & Bing. 297 ; *Knight* v. *Edgerton*, 12 E. L. & E. 562 ; *Hadley* v. *Barendell*, 26 E. L. & E. 398 ; or other independent branch of the case, as in the following : *Edie* v. *East India Co.* 2 Burr 1216, 1224, where Mansfield, C. J., says : " The verdict must be set aside generally, not in part only, yet this verdict is agreed to be right on the first count." *Goodright* v. *Saul*, 4 T. R. 357 ; *Campbell* v. *Rickard*, 5 B. & Ad. 840 ; *Kirby* v. *Harding*, 3 E. L. & E. 574 ; *Abbey* v. *Dale*, 6 E. L. & E. 422 ; *Hall* v. *Middleton*, 4 A & E. 107 ; *Tinkler* v. *Rowland*, 4 A. & E. 868.

The rule upon this subject, as it now seems to be held in Massachusetts, has grown up from an erroneous application of the English cases, upon the authority of which it was professedly adopted.

The earliest case cited from the Massachusetts Reports in support of the doctrine here contended for by the plaintiff, is *Lambert* v. *Craig*, 12 Pick. 199, which is open to two considerations, either of which is destructive of its authority here.

1.  The verdict was set aside, not for error in the court, but for the mistake of the jury in giving excessive or unwarranted damages.

2.  There is nothing whatever in the case, as reported, to show that the new trial was restricted to the question of damages alone. See *Bellows* v. *Copp*, 20 N. H. 492–504, where similar language was used, though the new trial was unquestionably of the whole case.

*Winn* v. *Ins. Co.*, 12 Pick. 279, is the next case in order of time, and was clearly a case where the plaintiffs were not entitled to a new trial as a matter of right.  It was granted by the court in the exercise of its discretion, and might as well have been upon terms that plaintiffs pay costs, or upon any other terms, as upon those in fact im-

posed. It is entirely within the doctrine of the English cases. *Boyd* v. *Brown*, 17 Pick. 453, is a similar case. The verdict was set aside upon the ground that the damages were excessive. In *Sprague* v. *Bailey*, 19 Pick. 436, it is by no means clear from the report, that the court assumed to restrict the new trial to a single point without the consent of the parties. The language of the court is, " this may be done, the parties consenting by &c.," p. 442. In *Robbins* v. *Townsend*, 20 Pick. 345–351, the court seems to have adopted the doctrine here contended for to its full extent, but apparently without any discussion of the question at the bar, evidently without careful consideration, and upon the sole authority of *Winn* v. *Ins. Co.*, and *Sprague* v. *Bailey*, by neither of which is it supported. No other cases are cited, and it seems plain that the court failed properly to distinguish between those cases in which a new trial is granted by the court, in the exercise of its discretion, and those in which it is the party's legal right. In subsequent cases, the court seems to have followed the precedent set by *Robbins* v. *Townsend*, without further examination. In no one of the cases, except *Winn* v. *Ins. Co.*, is any authority cited from the English, or indeed from any other reports.

It is confidently submitted, therefore, that the Massachusetts cases are not authority here. *Knowles* v. *Dow*, 22 N. H. 388–411, *Bank* v. *Eastman*, 44 N. H. 439, are distinct and direct authorities, that in this state a verdict will not be set aside in part, at least in cases like the one now under consideration, where a party is entitled to a new trial, as of right, for error in the instructions of the court.

The following cases are hardly less explicit : *New Boston* v. *Dunbarton*, 12 N. H. 409–413 ; *Kendall* v. *Fitts*, 22 N. H. 1–8 ; *Smith* v. *Foster*, 41 N. H. 215, 227–8 ; *Locke* v. *Smith*, 41 N. H. 346–354 ; *Taylor* v. *Jones*, 42 N. H. 38–39.

These authorities are supported by the uniform and invariable practice in this state, ever since the organization of our courts—a practice of such long continuance and settled uniformity as, in itself, to to constitute the law of this state, even if the common law had been otherwise.

The following are some of the cases to be found in our reports in which the doctrine contended for by the plaintiff might and undoubtedly would have been applied had it not been well understood by both court and bar that there was no warrant for it in law.

The common and universal understanding of the bar, for so long a period, must, of itself, upon a question of this kind, be deemed the very best evidence of what the law actually is ; and when not only fortified by the tacit acquiescence of the bench during all the same period, but also very recently affirmed by its solemn decisions, ought, it would seem, to be regarded as conclusive. *Davis* v. *Clement*, 2 N. H. 390 ; *Myers* v. *Toscan*, 3 N. H. 47 ; *Prichard* v. *Atkinson*, 3 N. H. 335 ; *Olcott* v. *Banfill*, 4 N. H. 537 ; *Robinson* v. *Burleigh*, 5 N. H. 225 ; *Sargent* v. *Graham*, 5 N. H. 440 ; *Lord* v. *Colby*, 6 N. H. 99 ; *Mathes* v. *Jackson*, 6 N. H. 105 ; *Fitzwil-*

*liam* v. *Troy*, 6 N. H. 166; *Lumbard* v. *Aldrich*, 6 N. H. 269; *Nottingham* v. *Barrington*, 6 N. H. 302; *Lamos* v. *Snell*, 6 N. H. 413; *Farnsworth* v. *Briggs*, 6 N. H. 561; *Mahurin* v. *Bickford*, 6 N. H. 567; *Farmington* v. *Brown*, 7 N. H. 271; *Stevens* v. *Lyford*, 7 N. H. 360; *Wheeler* v. *Rowell*, 7 N. H. 515; *Tewksbury* v. *Bucklin*, 7 N. H. 518; *State* v. *Wilson*, 7 N. H. 543; *Webster* v. *Harper*, 7 N. H. 594; *Barnstead* v. *Strafford*, 8 N. H. 142; *Harris* v. *Burley*, 8 N. H. 216; *Filer* v. *Peebles*, 8 N. H. 226; *Poplin* v. *Hawke*, 8 N. H. 305; *Mahurin* v. *Pearson*, 8 N. H. 539, and see *S. C. Mahurin* v. *Bellows*, on new trial, 14 N. H 210; *McCrillis* v. *Gile*, 8 N. H. 569; *Morrill* v. *Wallace*, 9 N. H. 111; *Hoit* v. *Underhill*, 9 N. H. 436; *Fitts* v. *Hall*, 9 N. H. 441; *Carter* v. *Burley*, 9 N. H. 558; *Crosby* v. *Wyatt*, 10 N. H. 318; *Pray* v. *Burbank*, 10 N. H. 377; *Hills* v. *Barnes*, 11 N. H. 395; *Boardman* v. *Page*, 11 N. H. 431; *Woods* v. *Garrett*, 11 N. H. 442; *Gale* v. *Tappan*, 12 N. H. 145; *Dow* v. *Sayward*, 12 N. H. 271 and see S. C. on new trial, 14 N. H. 9; *Sargent* v. *Stark*, 12 N. H. 332; *Wilson* v. *Knox*, 12 N. H. 347; *New Boston* v. *Dunbarton*, 12 N. H. 409–413; *Woods* v. *Dennett*, 12 N. H. 511; *Jones* v. *Bryant*, 13 N. H. 53; *Kimball* v. *Bellows*, 13 N. H. 58; *Ledden* v. *Colly*, 14 N. H. 33; *Clark* v. *Ricker*, 14 N. H. 44; *Greenleaf* v. *McColley*, 14 N. H. 303; *Sawyer* v. *Tappan*, 14 N. H. 352; *Williams* v. *Putnam*, 14 N. H. 540; *Smith* v. *Smith*, 15 N. H. 56; *Robertson* v. *Stark*, 15 N. H. 109; *State* v. *Copp*, 15 N. H. 212, which case, as well as *State* v. *Wilson*, 7 N. H. 543, cannot in respect to the facts be distinguished from, *Robbins* v. *Townsend*. *Martin* v. *Maynarl*, 16 N. H. 165; *Brigham* v. *Smith*, 16 N. H. 274; *Pendexter* v. *Carleton*, 16 N. H. 482; *Burns* v. *Pillsbury*, 17 N. H. 56; *Moore* v. *Merrill*, 17 N. H. 75; *Smith* v. *Moore*, 17 N. H. 380; *Evans* v. *Gale*, 17 N. H. 573; *Brown* v. *Ray*, 18 N. H. 102; *Hills* v. *Railroad*, 18 N. H. 181; *Brown* v. *Jewett*, 18 N. H. 230; *Hays* v. *Davis*, 18 N. H. 600; *Dunbarton* v. *Franklin*, 19 N. H. 257; *Daniels* v. *Railroad*, 20 N. H. 85; *Goodrich* v. *Foster*, 20 N. H. 177; *Clark* v. *Spaulding*, 20 N. H. 313; *Brackett* v. *Drew*, 20 N. H. 441; *Bean* v. *Smith*, 20 N. H. 461; *Bruce* v. *Snow*, 20 N. H. 484; *Bellows* v. *Copp*, 20 N. H. 492; *Bellows* v. *McCartee*, 20 N. H. 515; *Stickney* v. *Stickney*, 21 N. H. 61; *Gillis* v. *Bailey*, 21 N. H. 149; *Lisbon* v. *Bath*, 21 N. H. 319, and see S. C. on new trial 23 N. H. 1; *Page* v. *Babbitt*, 21 N. H. 389; *Kendall* v. *Fitts*, 22 N. H. 1–8; *Thurston* v. *Kennett*, 22 N. H. 157; *Gallup* v. *Mulvah*, 24 N. H. 204; *Willard* v. *Stevens*, 24 N. H. 271; *Wendell* v. *Moulton*, 26 N. H. 41–66; *Scammon* v. *Scammon*, 28 N. H. 419; *Bassett* v. *Salisbury Co.*, 28 N. H. 438; *Burke* v. *Allen*, 29 N. H. 106; *Huckins* v. *Ins. Co.*, 31 N. H. 328; *Fisk* v. *Hicks*, 31 N. H. 535; *Watson* v. *Walker*, 33 N. H. 131; *Daniels* v. *Brown*, 34 N. H. 454; *Lamoreaux* v. *Rolfe*, 36 N. H. 33; *Horne* v. *Railroad*, 36 N. H. 440; *Harvey* v. *Chase*, 38 N. H. 272; *Hall* v. *Dodge*, 38 N. H. 346; *Clark* v. *Pease*, 41 N. H. 414; *Smith* v. *Brown*, 43 N. H. 44; *Smart* v. *Blanchard*,

42 N. H. 137–152; *State* v. *Bartlett*, 43 N. H. 224; *Palmer* v. *Portsmouth*, 43 N. H. 265; *Cross* v. *Wilkins*, 43 N. H. 382; *Page* v. *Parker*, 43 N. H. 363; * *Woodbury* v. *Jones*, 44 N. H. 206; *M'f'g* Co. v. *Worster*, 45 N. H. 110; *State* v. *Knapp*, 45 N. H. 148; * *Woods* v. *Griffin*, 46 N. H. 230; *Garland* v. *Lane*, 46 N. H 245.

In the cases (nineteen in number) marked thus (*) the error for which the new trial was ordered affected the question of damages or betterments only.

No reason is apparent why, if the doctrine in question be adopted, a similar principle may not, with equal propriety, be applied to cases like the following, and judgment ordered at once, instead of sending them to a new trial. It would certainly be equally convenient to the court, and no more likely to prejudice the interests and rights of the parties. *Towle* v. *Hoit*, 14 N. H. 61; *Russell* v. *Perry*, 14 N. H. 152, in which, upon the opinion of the court, no question was open except the matter of damages—yet see S. C. on new trial, 16 N. H. 100. *French* v. *Eaton*, 15 N. H. 337; *Tudor* v. *Scovill*, 20 N. H. 171, and S. C. on new trial, 20 N. H. 174, illustrating the injustice which would often be done by the application of the doctrine in question. *Bliss* v. *Brainard*, 41 N. H. 256; *Lane* v. *Thompson*, 43 N. H. 326, and very many other cases of a like character to be found in our reports.

So also in cases where judgments are reversed upon error. *Holman* v. *Kingsbury*, 4 N. H. 104; *Hillsborough* v. *Deering*, 4 N. H. 86–96.

The cases in which a new trial is ordered unless damages are remitted are authorities not in favor of but against the plaintiff. The fact that, upon the new trial, the whole case is open, constitutes the chief inducement to make the remittitur. No case it is believed can be found in which the new trial granted, in case the plaintiff elects not to remit, has been restricted to that part of the damages, appearing to have been erroneously assessed. So also, where a verdict is set aside for error in relation to betterments, if the tenant does not choose to remit, the new trial is of the whole case.

It is not to be forgotten that the question here is not what the law ought to be, but what it is.

But even if it were a mere question of expediency, a restriction of the new trial to the particular issue affected by the error, is the utmost extent to which the doctrine if adopted at all could be carried. But see *Morrison* v. *Hauner*, 3 Bing. N. C. 759–764. Tindal C. J., *arguendo*, and cases before cited.

2. This court at the law term has no jurisdiction of the question, for the reason that no such question arose at the trial term, or was assigned and reserved to this court for decision. Genl. Stats., ch. 189 § 2.

The court is controlled by the provisions of the case sent up to it. *Page* v. *Carpenter*, 10 N. H. 77–82; *Davis* v. *Lane*, 10 N. H. 156–162.

*C. W. & E. D. Rand*, for the plaintiff.

Doe, J. I. The dwelling place of Isaac, at the time of the division of the town of Lyman, was in the part then made a separate town by the name of Monroe; and the defendant claims that Volney, being a minor, could then have had no other dwelling place than that of his father, within the meaning of the Revised Statutes relating to the settlement of paupers as affected by the division of towns.

Upon the division of a town, the division of the pauper settlements existing in the town, is made by the geographical line by which the territory of the town is divided. The rule prescribed by the statute for making this division of pauper settlements, is not a provision for gaining or establishing new settlements in the new towns. It is merely the method in which partition is made of the pauper burdens and duties of the old town. A person having a settlement in the old town, is not to gain a new settlement; but his settlement already acquired, is assigned on that side of the dividing boundary line on which his last dwelling place was. A dwelling place, and a place of pauper settlement, are not synonymous. *Phillips* v. *Kingfield*, 19 Me. 375.

The plaintiff did not claim that Volney had gained a settlement by his own action; but that, in the division of settlements, his derived settlement fell in that part of the old town in which his last dwelling place was; that before the division was made, he had been emancipated; and that when the division was made, his last dwelling place had been, not with his father in the section which became Monroe, but on the defendant's side of the line. Did his minority incapacitate him to have a dwelling place other than that of his father? He could have a wife and children, a house and homestead, and all the realities and appurtenances of a home in the common acceptation of the word. He dwelt where he pleased. In that respect, he was as free as his father. He could have a separate dwelling place as a matter of fact; and no useful end would be accomplished by holding that, though practically capable in general, he was theoretically or exceptionally incapable, of having a home of his own. No special reason calls for a peculiar construction of the statute; and "dwelling place" is to be understood in its ordinary and popular sense. The jury were properly instructed that an emancipated minor can acquire a different dwelling place from that of his parents.

II. The jury were instructed that in deciding whether Volney was emancipated while a minor, they would take the presumption that minors are not emancipated, into account as one element of evidence, and weigh it in connection with all the testimony.

The burden was on the plaintiff to prove that when the town was divided, the last dwelling place of Volney was in the defendant's territory. The plaintiff claimed that Volney, though a minor, had, by emancipation, acquired a right to have a home of his own, free from the control of his father. The emancipation of Volney was set up as an affirmative and essential part of the plaintiff's case; and, in

that view, it was necessary for the plaintiff to prove it. Without any evidence, or with evidence equally balanced, on that point, emancipation would not be proved. The burden of proof was on the plaintiff; and this burden was not sustained, unless the plaintiff proved it by a preponderance of all the evidence introduced on the subject. But it was not necessary for the plaintiff to produce any thing more than the slightest preponderance; or to produce a preponderance of any thing but evidence. Before any evidence was introduced, the scales in which the jury were to weigh the evidence, were exactly balanced; if they remained so after all the evidence was introduced, emancipation was not proved; if they tipped, ever so little, in favor of the plaintiff, emancipation was proved. It was not necessary that the evidence of the plaintiff should be heavier than the defendant's evidence increased by the indeterminate weight of a legal presumption. If the plaintiff's evidence was heavier than the defendant's evidence, it was heavy enough to prove emancipation.

If there was a presumption of law that minors are not emancipated, it amounted to no more than this, the plaintiff alleging emancipation had the burden of proof; and that was known without the assistance of a presumption. A legal presumption is a rule of law—a reasonable principle, or an arbitrary dogma—declared by the court. There may be a difficulty in weighing such a rule of law as evidence of a fact, or in weighing law on one side, against fact on the other. And if the weight of a rule of law as evidence of a fact, or as counterbalancing the evidence of a fact, can be comprehended, there are objections to such a use of it. In this case, on the question of emancipation, if the scales holding all the evidence on both sides, were even, did the presumption when added to the defendant's side, incline them in his favor? If it did, it had no effect on the case, because it was not necessary for the defendant to produce a preponderance of the evidence; if it did not, the jury were instructed to weigh as evidence, that which had no weight. If the scales holding all the evidence on both sides, preponderated in favor of the plaintiff, did the presumption, when added to the defendant's side, restore the equilibrium? If it did, the plaintiff was required to produce something more than a preponderance of the evidence; if it did not, it was useless.

A legal presumption is not evidence. In civil cases, it is the finding of a fact or the decision of a point, when there is no testimony, and no inference of fact from the absence of testimony, on the subject, or when the evidence is balanced. And often the fact is also found, or the decision made, by the rule of law which imposes the burden of proof on the party having the affirmative. When this is the case, the assignment of the burden of proof to one party, and the benefit of the legal presumption to the other, is a double and unjust use of one and the same thing.

Among the various ways in which the province of the jury has been encroached upon, in England, the use of legal presumptions as substitutes for evidence, is one of the most conspicuous. In this

country, where the right of the jury, and the right of parties to a full trial of facts by jury, are more carefully observed, the English collection of legal presumptions, is not to be adopted upon the mere strength of precedent. In each instance a critical examination is to be made to ascertain whether that which is asserted as a legal presumption is any thing more than a conclusion of fact at which the court may think the jury ought to arrive.

The presumption against the freedom of minors, was not an element of evidence; could not be weighed as evidence; and it does not appear that any use could rightfully be made of it in the case. It was put into the scale with the defendant's evidence, where it would be likely to mislead the jury, and give the defendant a material advantage to which he was not entitled; but this is no cause for setting aside the verdict on the defendant's motion.

III. The paupers who had been supported by the plaintiff, and whose settlement was in controversy, were the wife and children of Volney. The plaintiff's claim was based on the allegation that the paupers had their settlement in Lyman. Their settlement in Lyman must have been substantially alleged in the declaration. This allegation was supported only by evidence tending to show that they derived a settlement from Volney; that Volney derived a settlement from his father Isaac; and that Isaac had gained a settlement in Lyman. The case on this point was precisely as if Isaac had been the pauper, and the suit had been brought for his support.

The plaintiff claimed that Isaac had gained a settlement in Lyman, in the fourth method of Rev. Stats. ch. 65, sec. 1, by " having real estate of the value of $150,      *      *      *      in the town where he" dwelt and had "his home, and paying all taxes duly assessed on him and his estate for four years in succession," while he was " of the age of twenty-one years." The issue on this subject, was, in effect, whether Isaac, for four years in succession, had the four following qualifications: 1, age of 21 years; 2, a home in Lyman; 3, real estate in Lyman worth $150; 4, payment of all taxes duly assessed on him and his estate. If these four requisites existed for four successive years, he had gained a settlement in Lyman; if either of these requisites was wanting, he had not gained such settlement. The plaintiff alleged that Isaac had complied with these four requirements for four years in succession; and this allegation of the plaintiff was denied by the defendant. The defendant did not admit the plaintiff's case, and aver any new, separate and independent fact, in justification and avoidance, or in discharge of the plaintiff's cause of action. The defendant merely denied the truth of the plaintiff's entire allegation. The plaintiff had the affirmative and the burden of proof. In the absence of all evidence, there was no legal presumption that Isaac was, or was not, twenty-one years old; or that he had, or had not, his home in Lyman; or that he had or had not real estate in Lyman worth $150; or that he had or had not paid all taxes duly assessed on him and his estate. And in the absence of all evidence and all legal presumption on any one of these four points, the

plaintiff's burden of proof, on that point, was not sustained; for it could be sustained only by evidence or legal presumption. It was indispensable that the plaintiff should introduce some evidence tending to sustain the burden of proof as to the payment of all taxes duly assessed, as well as on each of the other three points. *Pittsfield* v. *Barnstead*, 38 N. H. 115.

The allegation that Isaac paid all taxes duly assessed four years in succession, is not an assertion that he paid taxes; nor is it an assertion that taxes were not assessed; but it is an assertion that he paid taxes four years in succession, or that taxes were not assessed in the years in which he did not pay taxes. The circumstance that the averment is an alternative proposition, does not relieve the plaintiff from the burden of proving, either the one, or the other, of the alternatives. If the averment is put in this form: Isaac paid taxes if any were assessed: it is still an alternative proposition in contemplation of law; its legal effect is not changed by a variation of phraseology. The plaintiff having the affirmative of the proposition as an entirety, does not show that it is more probable than otherwise that it is true as a whole, unless there is some evidence tending to show the truth of one or the other of the separate propositions implied and included in it. The entire proposition is to be taken in the sense of the statute; and the statute does not provide that a person takes a step in gaining a settlement, by paying all such taxes as shall afterward, on the trial of a case, be proved, by a party denying the settlement, to have been assessed. It is for the party necessarily alleging the settlement, to prove it; and it is not proved, unless payment of all taxes assessed, is proved. Payment of all taxes assessed is an affirmative fact indispensable to the plaintiff's case, and without evidence and without legal presumption, it is not proved. Being a fact stated in the alternative proposition that taxes were paid or were not assessed, it would be established by proof of either of the alternatives, by proof that taxes were paid, or by proof that taxes were not assessed. But unless one or the other part of the proposition is proved, the proposition as an entirety is not maintained. It is maintained by proof of either of its parts, but not by proof of neither of them.

Suppose the statute required non-assessment of taxes on Isaac and his estate four years in succession, instead of payment of all taxes assessed: the plaintiff would have the burden of proving the non-assessment. Whether the requisite were assessment or non-assessment, if it were a requisite without which there would be no settlement, the plaintiff, having the burden of proving the settlement, would have the burden of proving the constituent elements of the settlement. If the requisite were non-assessment, it would be a negative in form of expression, but it would be an affirmative within the meaning of the rule that the party who must affirm a fact must prove it if it is denied by the other party. 1 Bennett & Heard Lead. Cr. Cas. 299–319 (2d ed.). A plaintiff must affirm every fact necessary to the maintenance of his action; and if non-assessment were an

indispensable ingredient of a settlement, a plaintiff affirming a settlement would affirm non-assessment, and he would have the affirmative of what he affirmed.

In actions for malicious prosecution, on the point of no probable cause (2 Saund. Pl. & Ev. 332 ; *Eastman* v. *Keazor*, 44 N. H. 520), and in actions for not having or not using, knowledge, skill, or care, (*Leighton* v. *Sargent*, 27 N. H. 460, 475 ; S. C. 31 N H. 119, 136), the plaintiff affirms a literal negative, which, on the general issue, he must prove. Such cases, countless in number, and infinite in form, covering extensive departments of the law of contract and tort, are illustrations not of presumptions or exceptions or peculiar rules, but of the elementary principle which lays the burden of proof on the party having the affirmative of the issue, or, in other words, requires a party to prove his own side of the case.

And there is a great mass of cases, in which, upon the general issue, the plaintiff has the burden of proving that he was careful, and that the defendant was not careful (1 Hilliard on Torts, ch. 4, § 2) : as in actions against towns for defective highways. *Norris* v. *Litchfield*, 35 N. H. 271, 276 ; *Clark* v. *Barrington*, 41 N. H. 44, 50, 52 ; *Howe* v. *Plainfield.* 41 N. H. 135, 138 ; *Tucker* v. *Henniker*, 41 N. H. 317 ; *Winship* v. *Enfield*, 42 N. H. 197, 213 ; *Palmer* v. *Portsmouth*, 43 N. H. 265, 267, 269 ; *Chamberlain* v. *Enfield*, 43 N. H. 356, 363 ; *Chicago* v. *Mayor*, 18 Ill. 349. It is to be observed however, that this burden of proof, in theory, often appears to be more formidable than it is in practice. The ordinary evidence of the plaintiff's damage generally has some tendency to show that it was caused by the faults of the defendant [*Leighton* v. *Sargent*, 31 N. H. 136] ; and evidence going to show that, generally tends to show it was not caused by the fault of the plaintiff. *Hill* v. *N. Haven*, 37 Vt. 508.) In an action for driving against the plaintiff on the highway, a sleigh (*Lane* v. *Crombie*, 12 Pick. 177), or a car (*Gahagan* v. *R. R.* 1 Allen 190 ; *Robinson* v. *R. R.* 7 Gray 92), the plaintiff must prove that he was careful and that the defendant was not careful. Cases involving this double aspect, are among the most common. In such cases, the plaintiff has the affirmative of the proposition that he used reasonable care ; and he has the affirmative of the proposition that the defendant did not use reasonable care ; for the simple reason that the plaintiff is the party who does affirm, and must affirm, each of the propositions although they are diametrically opposed to each other in form of language. A so-called negative affirmation is an affirmation and not a negation.

In assigning the burden of proof to one party rather than to the other, the law acts upon a better reason than a verbal distinction. The burden is imposed according to a plain principle of natural justice. The party who affirms as part of his case, a fact denied by the other party, has the affirmative, however much literal negation there may be in his affirmation ; and it is just that he should be required to prove the essential facts of his case, whether he states them in the form of a negative affirmation or in any other form.

Great confusion has arisen among the authorities, from the frequent application of a verbal, instead of the legal, test, of the affirmative of an issue.

" In every issue the affirmative is to be proved.    *    *    *    But to this rule there is an exception of such cases where the law presumes the affirmative contained in the issue.    Therefore in an information against Lord *Halifax* for refusing to deliver up the rolls of the auditor of the exchequer ; the court of exchequer put the plaintiff upon proving the negative, viz : that he did not deliver them ; for a person shall be presumed duly to execute his office till the contrary appear." Bull. N. P. 298.    This report of Lord Halifax's case, indicates that the information contained an affirmation that he did not deliver the rolls, and that this alleged non-delivery was the gist of the information, and was traversed in pleading.    If such was the case, the prosecutor, affirming non-delivery, had the burden of proof which the law attaches to the affirmative.    But the court attached the burden to the literal, and not to the legal, affirmative, and then shifted the burden by a legal presumption.    The literal affirmative was mistaken for the legal affirmative ; this mistake placed the burden of proof on the wrong party ; that error was corrected by constructing or impressing a legal presumption to transport the burden from the defendant to the prosecutor ; and this case of mistaken affirmative, unnecessary circuity, and superfluous presumption, has become a leading authority, and has done much to entangle and obscure a very simple principle of law.

In *Williams* v. *E. I. Co.*, 3 East 192, the plaintiff claimed damages for the negligence of the defendant, and the right conclusion was reached by the erroneous circuit of Lord Halifax's case.    It was decided that the burden was on the plaintiff to prove negligence. But instead of requiring him to prove it because he necessarily alleged it, and because his allegation was traversed by the defendant, it was held that the particular negligence complained of, would be a criminal neglect of duty, and then the aid of a presumption was invoked to throw the burden of proof on the plaintiff.    " Generally speaking," said Dallas Ch. J., in *Calder* v. *Rutherford*, 3 B. & B. 302, " the rule is, that the affirmative of the issue must be proved, and the case of *Williams* v. *East India Company* is an exception," This remark is a fair instance of the prevalent error.

By confounding the affirmative of the issue with the literal affirmative, the legal negative is constantly mistaken for the legal affirmative, and undesirable results are reached from which there is no escape except by complex processes and a liberal use of so-called legal presumptions and exceptions to general rules.

To ascertain which party has the affirmative of a proposition, we do not enquire, whether it is expressed in affirmative or negative terms, but we enquire which party affirms the proposition in order to make out his case, and whether it is traversed by the other party. 1 Phil. Ev. 812 (4th Am. Ed.)    The rule is elementary.    When a plaintiff grounds his right of action upon a negative allegation, he

has the burden of proof. 1 Gr. Ev. § 78. But Greenleaf erroneously says that this is an exception to the general rule. It is merely an application of the general rule. In *Barnstead* v. *Alton*, 32 N. H. 245, 255, the court said, " on general principles, the plaintiff affirming the existence or non-existence of facts, or a state of facts essential to his right of recovery, is bound to prove the existence or non-existence of what he avers, and what is essential to his right of recovery. Nor does it change the rule, that the averment is negative. The proof may be more difficult, but it is not the less imperative. Less evidence may be sufficient, but the plaintiff is not the less bound to satisfy the jury that what he alleges is true.  *   *   * When the plaintiffs ground their right of action upon a negative allegation, and when, of course, the establishment of this negative, is an essential element in their case, then the proposition affirmed, though negative in its terms, must be proved by the party who states it." In that case, the mother of a pauper had a settlement in Alton, unless her husband had a settlement elsewhere in this state ; but as she would have the settlement of her husband if he had any in this state, it was held that the burden of proof was on the plaintiff to show that the husband had not a settlement. The decision of this point in *Barnstead* v. *Alton*, was affirmed in *Hampstead* v. *Plaistow*, in Rockingham, December, 1868, Perley, C. J., delivering the opinion.

In the present case, the jury were instructed that taxation would not be presumed ; and that it was unnecessary to consider whether Isaac paid taxes until it was proved that there were taxes to be paid. There was no legal presumption that taxes were, or were not, assessed. But the effect of the ruling that it was unnecessary to consider whether Isaac paid taxes until it was proved that there were taxes to be paid, was, to entirely relieve the plaintiff from the burden of proof as to the payment of all taxes assessed, unless the defendant proved that taxes were assessed ; and to put upon the defendant the burden of proving assessment of taxes. This result was at variance with the rule which attaches the burden of proof to the legal, not to the verbal, affirmative.

IV. Was the burden of proof taken from the plaintiff and placed upon the defendant by an exception to the rule, on the ground that the subject-matter was peculiarly within the knowledge of the defendant?

When in the nature of things, or the circumstances of the case, it would be more difficult for one party to prove an allegation essential to his side of the cause, if it were true, than it would be for the other party to disprove it, if it were not true, the omission of the latter to produce certain proofs, (the omission of the defendant, in a criminal case, to testify, being excepted, laws 1869, ch. 23 sec. 2), may be evidence against him and in favor of the former, the absence of proof on one side, may be equivalent to express proof on the other. *Ela* v. *Kimball*, 30 N. H. 126, 135 ; *Carter* v. *Beals*, 44 N. H. 408, 413 ; 1 Ben. & H. Lead. C. C. 318,

319, (2d ed.), and authorities there cited. It is often more difficult to prove a literal negative than a literal affirmative; but the inference drawn from the non production of evidence, and a comparison of the means of proof in the control of the parties, is not necessarily in favor of the party making a so-called negative allegation. The weight of this circumstantial evidence, depends on the degree of facility or inconvenience with which certain proofs, if they existed, could be produced by either party. The greater the difficulty on one side, and the less the difficulty on the other, the stronger is the inference against the latter and in favor of the former. *Rex* v. *Burdett*, 4 B. & Ald. 122, 123, 140, 161. It is a matter of degrees, and a matter of fact.

It might be claimed that when the difficulty under which one party labors in proving his averment if true, amounts practically to an impossibility, and, if not true, it can be disproved by the other party with perfect ease, the omission of the latter to disprove it, is circumstantial evidence tending to prove the averment. It might be argued that the non-production of the only available evidence, is equivalent to the proved suppression or destruction of evidence. 1 Gr. Ev. § 37; 3 Id. 408; Broom Leg. Max. 726; *State* v. *Simons*, 17 N. H. 83, 88, 89; *Kidder* v. *Norris*, 18 N. H. 535. It may be doubted whether there is any need of an exceptional rule of law to change the burden of proof, even when the difficulty of proving an averment amounts to impracticability. It may be found on careful examination that such an exceptional rule *is* one of the numerous judicial invasions of the province of the jury, and an unnecessary transformation of a matter of fact into a matter of law.

But, however that may be, it would seem that nothing less than obvious impracticability on one side, contrasted with obvious feasibility on the other, can authorize the invention of an exception to release a litigant from his duty of proving the essential facts of his case. The question of the existence of such impracticability and feasibility, is a question chiefly of fact. No rule of law has yet been found for the decision of that question; and if any such rule had formerly been constructed, it would now be greatly modified in civil cases, by our recent statutes allowing parties to be witnesses.

For the attempt to establish an exception changing the burden of proof on the ground of the difficulty and facility of furnishing proof, we seem to be largely if not wholly indebted to a rigorous enforcement of the English game laws, and the undue influence of a small governing class asserting their superior rights under peculiar institutions not brought to this country and hostile to our system of society. The authorities supporting the exception, rest upon game-law precedent. But what the game-law precedent rests upon, aside from the oppression of the peasantry and common people of England in former times, is not so clear. Obscure in its early history, it may have been founded on an inference of fact, or a misapprehension of the affirmative of the issue. It may have been devised by the

oppressors for their own convenience. *Johnson* v. *Patterson*, 14 Conn. 1, 6.

" Nothing can be more oppressive than the present system of the game laws," said Mr. Justice Willes in 1785. *Jones* v. *Smart*, 1 T. R. 49. Blackstone characterizes them as tyrannical, and their punishments as severe and implacably inflicted. 4 Bl. Com. 174, 416. They were calculated * * * to promote the pleasures of the great by restricting those of the lower orders of society," and were " attended with particular circumstances of aggravation." 3 Reeves Hist. Eng. L. 214, 215, 2d ed.

When, in a prosecution on the game laws, it was charged that the defendant had killed a partridge, the defendant then and there not having the necessary aristocratic qualification, the burden was put upon him to prove that he did not belong to the inferior class of men disabled by law to kill game. *King* v. *Turner*, 5 M. & S. 206; Bac. Abr. *title* Game; Com. Dig. *title* Justices of the Peace (B. 43). But when a penalty was claimed of a sailor on the charge that he had left his ship, not having the necessary qualification by license in writing, the burden was not put on him to prove he had a license, but on the other party to prove no license. *Frontine* v. *Frost*, 3 B. & P. 302. And if, in an action brought by a clergyman to recover a benefice, it was a necessary part of his case that he had the qualification of having subscribed the XXXIX Articles in the presence of the Bishop of Durham, the burden was not put on the plaintiff to prove this affirmative part of his case, but on the defendant to prove the negative. *Powell* v. *Millburn*, 3 Wils. 355, 366; S. C. 2 W. Bl. 851. The prosecutor was relieved of the burden of proving the negative. *Powell* v. *Millburn*, 3 Wils. 355, 366; S. C. 2 W. Bl. 851. The prosecutor was relieved of the burden of proving the want of qualification alleged by him at the expense of the game killer; the party claiming a penalty, was not relieved of the same burden at the expense of the sailor; while the burden of proving his own qualification alleged by himself, was taken from the clergyman and cast upon his opponent. In the triangular conflict of these cases, each of them is supported by other cases. There is an exception against the qualification of a man to kill a partridge; and a legal presumption in favor of the qualification of a man to administer the ordinances of a state church; and no exception or legal presumption for, or against, the qualification of a man to leave a ship.

The value of such authorities must be chiefly historical. If there could be one rule for game killers, and another for sailors, and another for clergymen, the application of these clashing regulations to other classes of men, would be perplexing. When the judge stands ready with an exception, in one hand, for a difficulty of proof; and a legal presumption, in the other, that everything has been rightly done (Broom L. Max. 729); and uses the exception or the presumption, or declines to use either, in the arbitrary style of the precedents, the disposition of the burden of proof, and the result of the trial so far as it depends on the disposition of that burden, appear to be capriciously determined.

The simple, plain, methodical, and sensible system of the common law, is composed of a few elementary principles. To these have been added presumptions, exceptions, fictions, and refinements, excessively multiplied and extended in intricate and attenuated forms, with a great amount of fact wrongfully converted into law. The labyrinth of authority, already vast and dark, and rapidly growing vaster and darker, is beginning forcibly to suggest the necessity of recurring to fundamentals. If some of the skill exercised in inventing special and exceptional rules, and changing presumptions of fact into presumptions of law, were used in following general principles in their full operation and complete development, distinguishing between law and fact, submitting questions of fact to the jury, and clearing the law of the mass of fact with which it is now encumbered, it might be more easily and thoroughly understood and more rationally and justly administered. And it may be well to consider whether some effort can be usefully directed towards making precedent more natural and logical, less artificial and incoherent, in vindication of the claim that the law is a science and the perfection of reason.

The strength of the exception requiring the defendant to prove his qualifications under the game laws, was seriously impaired, if not destroyed, by Lord Kenyon when he said in *King* v. *Stone*, 1 East 650, 651, " Evidence may be given of his condition in life, to raise a reasonable presumption against his having any of the necessary qualifications. * * * Shall it be sufficient for the witness to say that he saw such a person (perhaps a nobleman· of the highest rank and largest fortune in the kingdom) out a shooting on such a day ; and shall that be sufficient to convict him because the information, which is not upon oath, contains in point of form an allegation that the defendant was not qualified? If this were sufficient to warrant a conviction unless the defendant proved his own qualification, it may be necessary for him to bring his title deeds and witnesses from the furthest part of the kingdom, in order to show his qualification. The proposition is monstrous, and the inconvenience and vexation would be insufferable." If the inconvenience and vexation of proving their qualifications, had often fallen upon the privileged class, the game-law exception might not have been invented. But persons of that class were seldom if ever prosecuted for doing what they had a legal right to do. The oppressed class were prosecuted and imprisoned in great numbers, (Sydney Smith on the Game Laws, Ed. Rev. 1819 ; Welford's Influence of the Game Laws, App. 64,) and the exception gave the ruling class an advantage in enforcing their exclusive privilege.

Nearly all the prosecutions were begun and ended before justices of the peace. The justices were esquires. 1 Bl. Com. 406. And the fact that esquires had sufficient property to qualify them to kill game, was so universal that it was taken for granted by parliament. *Jones* v. *Smart*, 1 T. R. 44, 45, 51, 52. The violators of the game laws, ignorant, poor, and helpless, were summarily tried and con-

victed, without counsel, by magistrates interested in the preservation of the game for their own amusement. It would not be surprising, if, under such circumstances, there should grow up a practice of presuming from the evidence furnished by the personal appearance of the accused, that, as a matter of fact, they were men of low degree and not qualified for the recreation monopolized by persons of quality, and distinction. Nor would it be remarkable if such a practice, continuing, generation after generation, and gathering the force of custom among the upper sections of society, who cherished ancient usage as consecrated by the wisdom of their fathers, should come to be considered as a part of the law of the land. Whether, in its early days, it was law or fact, was a question not likely to trouble the hunting squires, because, in their compound function of judge and jury, the distinction between law and fact was lost.

The jurisdiction of these magistrates, had been actively exercised in this business for centuries, when it was enacted in 1722, that the game laws might be enforced by "any of his majesty's courts of record" as well as by justices of the peace. In the courts of record, the time had not come for separating fact from law. Inferences of fact were constantly asserted as legal presumptions, and the court instructed the jury on the weight of evidence. *State* v. *Pike*, 49 N. H. 416, 417, 436, 437, 438, 444. When, on any point, one party had introduced some evidence, it was the practice of the court to say that the burden of proof was shifted, meaning that the weight of the evidence was sufficient for a verdict. Courts habitually spoke of the burden of proof in a manner which clearly shows that the distinction between the legal burden of proof and the actual weight of the evidence was not recognized. And the want of this wide and vital distinction between the practical necessity of introducing evidence on one side to counteract the effect produced in the minds of the jury by the evidence on the other side, and the legal necessity of sustaining the burden of proof by producing a preponderance of the whole evidence in civil cases and a reasonable and moral certainty in criminal cases, is enough to account for many aberrations that formerly prevailed in the burden of proof. The discussion of this subject in 1 Bennett & Heard Leading Criminal Cases, 351, 352, 359, 1st ed. ; Id. 299–302, 318, 2d ed. ; *Powers* v. *Russell*, 13 Pick. 76, 77 ; *Tourtellot* v. *Rosebrook*, 11 Met. 460 ; *Brown* v. *Kendall*, 6 Cush. 298 ; *Delano* v. *Bartlett*, 6 Cush. 364 ; *Burnham* v. *Allen*, 1 Gray 496 ; *Phelps* v. *Cutler*, 4 Gray 137 ; *Smith* v. *Porter*, 10 Gray 66 ; *Estabrook* v. *Boyle*, 1 Allen 412 ; *Ross* v. *Gerrish*, 8 Allen 147 ; and other authorities there cited ; has greatly conduced to a better understanding of the true doctrine in this country. Such cases as *Bliss* v. *Brainard*, 41 N. H. 257, 262, and *Doolittle* v. *Lyman*, 44 N. H. 608, may perhaps be sustained by the principle of the Massachusetts cases in which, on the question of a legal consideration for a promise, under the general issue or any other plea traversing the consideration, the plaintiff's burden of proof never shifts.

The game-law burden of proof, in the comparatively few game

suits brought in the higher courts, may have originally come from magistrates' practice, or from the same influences that surrounded the magistrates, or from the evidence against the accused generally furnished by their personal appearance, or from the common mistake of ascertaining the affirmative of the issue by a verbal test.

In 1718, testimony given in general terms that the defendant was not qualified, was held not sufficient. *Rex* v. *Marriott*, 1 Stra. 66. Why was it not sufficient if no testimony on the subject was necessary? In 1757, Lord Mansfield, citing that case with approval, said, " The justices who convict *upon the evidence* of the witness, can have no other or FURTHER ground to go upon than what the witness swears." *Rex* v. *Jarvis*, 1 Burr. 153 (S. C. 1 East 644 *note*). And Denison J. said, " The evidence and adjudication ought *both of them* to be 'That he has *not* these qualifications. * * *.' " Id. 154. In 1737, it was understood that the burden of proof as to qualification, was on the prosecutor in cases brought before justices of the peace, and on the defendant in cases brought in other courts. *Bluet* v. *Needs*, Com. 522, 525. In 1780. in *King* v. *Wheatman*, 1 Doug. 345, the defendant claimed that his conviction was bad because it was not specifically alleged in the information that he had none of the qualifications. The prosecutor argued that the conviction was good because it appeared by the record that the evidence proved the defendant was not qualified. Ashhurst J. said, " The evidence must prove, but cannot supply any defects in, the information." In 1801, the King's Bench was equally divided on the question of the burden of proving qualification in cases brought before magistrates,—the judges who were for putting the burden on the defendant, mistaking the negative for the affirmative of the issue, and apparently taking it for granted that the long-established custom of having but one witness against a game killer, rendered a greater number unnecessary. *King* v. *Stone*, 1 East 639. In 1816, when it was settled that the burden belonged to the defendant, the only authorities cited for the decision were " the prevailing opinion of the profession and the practice," and two *dicta*. *King* v. *Turner*, 5 M. & S. 206.

In all the courts, inferior or superior, exceptions and presumptions enough were finally adopted to vigorously chastise the powerless majority of the people for killing partridges and rabbits the protection of which, for the diversion of the few, was one of the chief ends of English government. Much more stress was laid on the duty of courts to convict the accused, than on their duty to administer the law impartially; the statutes were, in effect, construed to prohibit the killing of game by any person who should not, on trial, prove his qualification; " the witness" was spoken of, in a manner to show that a custom had practically grown into a legal notion that one witness against a game-killer must be enough; and the legal affirmative and negative of the issue were confounded,—the indispensable affirmation of the prosecutor that the defendant was not qualified, was erroneously treated as a legal negation because it contained a verbal negative.

In *King* v. *Turner*, Lord Ellenborough said, " The question is, upon whom the *onus probandi* lies ; whether it lies upon the person who affirms a qualification, to prove the affirmative, or upon the informer, who denies any qualification, to prove the negative. There are, I think about ten different heads of qualification enumerated in the statute, to which the proof may be applied ; and, according to the argument of to-day, every person who lays an information of this sort, is bound to give satisfactory evidence before the magistrates to negative the defendant's qualification upon each of those several heads.   The argument really comes to this, that there would be a moral impossibility of ever convicting upon such an information. \* \* \*  And does not, then, common sense show, that the burden of proof ought to be cast on the · person, who, by establishing any one of the qualications, will be well defended?   Is not the statute of *Anne* in effect a prohibition on every person to kill game, unless he brings himself within some one of the qualifications allowed by law ; the proof of which is easy on the one side, but almost impossible on the other?   I remember the decision of *Rex* v. *Stone;* and the arguments of the learned Judges, who held the necessity of giving negative proof, were undoubtedly urged with great force ; but I felt at the time, that if they were right, it would, in most cases, be impossible to convict at all."   Mr. Justice Bayley said, " I have always understood it to be a general rule, that if a negative averment be made by one party, which is peculiarly within the knowledge of the other, the party within whose knowledge it lies, and who asserts the affirmative is to prove it, and not he who avers the negative.   And if we consider the reason of the thing in this particular case, we cannot but see that it is next to impossible that the witness for the prosecution should be prepared to give any evidence of the defendant's want of qualification. \* \* \*  The witness would have to depose to a multitude of facts ; he must swear that the defendant has not an estate in his own or his wife's right, of a certain value ; that he is not the son and heir apparent of an esquire, &c."   Mr. Justice Holroyd said, " It is a general rule that the affirmative is to be proved, and not the negative, of any fact which is stated, unless under peculiar circumstances, where the general rule does not apply. Therefore it must be shown, that this is a case which ought to form an exception to the general rule.   Now all the qualifications mentioned in the statute, are peculiarly within the knowledge of the party qualified. \* \* \*  Instead of saying that the general rule of law ought not to apply to this case, it seems to be the very case to which the rule ought peculiarly to apply."

Even if the doctrine of *King* v. *Turner* were sound, it would not relieve a party from the burden of proving his case, unless it were practically impossible for him to prove it, and very easy for his opponent to disprove it : for these are conditions particularly emphasized in *King* v. *Turner*.   Proving his case, must be understood, so far as the burden of proof is concerned in civil actions, to be the production of some evidence, however slight, tending to prove it ; and

Lord Kenyon's opinion that sufficient evidence of a game-killer's want of qualification might be given even in a criminal case, has never been refuted. When it appears, on any question, that a party has produced all the evidence in his power, or all that he can obtain by reasonable effort and expense, however slight it may be, and it also appears, from particular testimony or the nature of the subject, that his opponent does not produce proof which he could easily obtain if his side of the question were true, the slight evidence produced by the former, and the circumstantial evidence of non-production by the latter, may be, as a matter of fact, very strong· proof against the latter. *Com.* v. *Bradford*, 9 Met. 271. All this belongs to the weight of evidence for the consideration of the tribunal trying the fact, and does not affect the burden of proof to be fixed by a court of law.

*The Apothecaries' Co.* v. *Bentley*, Ryan & Moody N. P. 159, (S. C. 1 C. &. P. 538) was an action for a penalty on a statute for practising as an apothecary " without having obtained such certificate as by said act is required." The plaintiffs relied on *King* v. *Turner*. " Abbott Ld. C. J. I am of opinion that the affirmative must be proved by the defendant. I think that, it being a negative, the plaintiffs are not bound to prove it; but that it rests with the defendant to establish his having a certificate." Here again is the familiar mistake of using a verbal test to determine who has the affirmative of the issue. The conspicuous error of such cases may be useful, but not as precedent to be followed. *Doe* v. *Whitehead*, 8 A. & E. 571, decided in 1838, was ejectment brought on alleged forfeitures by breaches of the defendant's covenants to repair and to insure against fire in some office in or near London. The plaintiff relied upon the game-law and apothecary cases, and claimed that the fact of insurance ought to be proved by the defendant, as it would be a great inconvenience for the plaintiff to summon clerks from all the insurance offices in and near London to show that no insurance had been effected; and, if the production of a license by the defendant in *State* v. *Foster*, 23 N. H. 352; would have been sufficient, it might have been argued that the production of a policy of insurance by the defendant, would be sufficient. But it was held that the burden was on the plaintiff to prove that the defendant had not obtained a policy. Lord Denman said, "I do not dispute the cases on the game laws which have been cited; but there the defendant is, in the first instance, shown to have done an act which was unlawful unless he was qualified; and then the proof of qualification is thrown upon the defendant. Here the plaintiff relies on something done or permitted by the lessee, and therefore takes upon himself the burden of proving that fact. The proof may be difficult where the matter is peculiarly within the defendant's knowledge; but that does not vary the rule of law."

Lord Denman's idea of the game-law exception, is left in obscurity. It would seem that he did not put it on the ground that " the proof may be difficult (on the part of the plaintiff) where the matter is peculiarly within the defendant's knowledge," for he explicitly

declared " that does not vary the rule of law." He may have based it upon Blackstone's theory of special exemption from a general disability of slavery (2 Bl. Com. 410–419), or a peculiar construction of the game statutes, making them " a prohibition on every person to kill game unless he brings himself within some one of the qualifications," as suggested by Lord Ellenborough in _King_ v. _Turner_. He may have considered game killers liable to a legal presumption of unlawfulness like the legal presumption of malice and criminal intent, which has prevailed in England, but does not prevail here. _State_ v. _Bartlett._ 43 N. H. 224; _State_ v. _Pike_, 49 N. H. 431; _Com._ v. _McKie_, 1 Gray 61; 1 Ben. & H. L. C. C. 358–362, 2d ed. In some criminal cases, there is an English rule, irregularly modified by exceptions and presumptions, that when an act is proved which might be innocent and might be criminal, it is presumed to be criminal, and the burden is on the defendant to prove it, innocent. " All the circumstances of accident, necessity or infirmity,"—all " matters tending to justify, excuse, or allevate" must be proved by the defendant " unless they arise out of the evidence produced against him." Foster's Crown Law 255; _Com._ v. _York_, 9 Met. 93, 101–124. This perversion of the true principle, is not susceptible of the mollifying construction suggested in _State_ v. _Bartlett_, 43 N. H. 232, 233, 234. It is a presumption of fact turned into a presumption of law. It is a broad error capable of producing the game-law doctrine. If the unlawfulness of an act which may be lawful or unlawful, is presumed in criminal cases, as it has been in English practice, why not presume that killing game is unlawful, and thus put the defendant to prove his qualifications as " matters tending to justify" or " excuse" him? In that system of practice, the consideration of " a negative averment peculiarly within the defendant's knowledge," is quite superfluous. There would be no more difficulty in presuming the want of qualification alleged in an information for killing a partridge, than in presuming the malice alleged in an indictment for murder. It would be as easy for the court to find, by a presumption of fact remodeled into a presumption of law, that the killing of a rabbit was unjustifiable, as to find, by the same process, that a homicide was unjustifiable.

In _Bliss_ v. _Brainard_, 41 N. H. 256, 262, the court doubted whether the burden of proving license in liquor cases, could rest on the ground on which it had been put; and it was suggested that " perhaps it might better rest on" the ground that as " only one man in a thousand or more could be licensed to sell, the presumption would be that the sale by any individual was unauthorized." If there can be such a presumption, it is an inference of fact like the English presumption that homicide is unjustifiable because men are not generally authorized to kill each other. Such deductions, when possible, may be drawn by the jury, but cannot be changed by the court into presumptions of law, for the purpose of changing the burden of proof and compelling defendants in state cases to prove the literal, legal, formal and sub-

stantial negative, that they are not criminals, *State* v. *Barttett*, 43 N. H. 234.

The effect of a traverse of a material allegation of the plaintiff, leaving the affirmative and the burden of proof on him, was admitted in *Doe* v. *Whitehead*, by the suggestion of counsel and of Mr. Justice Patterson during the argument, and of Mr. Justice Littledale in the decision, that if the action had been in covenant, the defendant, under the new English rules of 1834, would have been compelled to specially plead performance (Ch. Pl. 518), and the plaintiff, by traversing this plea, would have left the affirmative and the burden of proof on the defendant. Whether such a plea of performance should be regarded as anything but a traverse of an essential averment of the declaration (*Soward* v. *Leggatt*, 7 C. & P. 613; *C. K. Co.* v. *Rawlings*, 3 Bing. N. C. 76; *Estabrook* v. *Boyle*, 1. Allen 412); and whether such a traverse would transfer to the defendant, the burden of proof which the general issue would leave on the plaintiff, we need not here enquire.

The game-law exception, having been established, was extended to a few other cases : but as it stands in the books, it has no consistent or satisfactory foundation in principle or authority. It has been extended to the liquor laws of this state. *State v. Foster*, 23 N. H. 348, 352; *State* v. *McGlynn*, 34 N. H. 422, 426; *State v. Shaw*, 35 N. H. 217; In *State* v *Foster*, it was held that if the defendant had been licensed he could readily have produced the license; while to prove the negative the government would have been compelled to summon the town clerk to appear with the records of the town. In *Barnstead* v. *Alton*, 32 N. H. 245; it was argued by counsel that the difficulty of proving that a man had no settlement in any one of two hundred towns, would, in most cases, be exceedingly great, and, in many, inseparable; but it was held that such a degree of difficulty did not change the burden of proof although the difficulty was vastly greater than the summoning of one town clerk with his records in *State* v. *Foster*. In the latter case it was said that if the defendant had been licensed he could readily have produced the license. How could the court have known he had not lost it? If he had not lost it, why should he, rather than the state, have been compelled to summon the town clerk? Whence arose a legal presumption that he had not lost a license? How did such a presumption overcome the presumption that he was not guilty? What made the former presumption heavier than the latter? And if the defendant had produced a writing purporting to be a license, signed by certain persons assuming to sign it as selectmen, how would it have been admissible without evidence tending to show that the signatures were genuine, and that the signers were selectmen? The defendant could not have been a witness. Why should he have been compelled to summon witnesses to prove the signatures and the authority of the signers, in order to save the state from the insignificant and immaterial inconvenience of summoning the town clerk?

In Massachusetts, the consistency of the common law, on this

point, has been preserved by adopting the doctrine of *Barnstead* v. *Alton*, in *Amherst* v. *Shelburne*, 13 Gray 341, 344; and by rejecting the doctrine of *State* v. *Foster*, in *Com.* v. *Thurlow*, 24 Pick. 374, 381, and in *Com.* v. *Lahy*, 8 Gray 459.

In *Com.* v. *Thurlow*, Judge Shaw, delivering the opinion of the court, said, " If a party is licensed as a retailer under the statutes of the commonwealth, it must have been done by the county commissioners for the county where the cause is tried, and within one year next previous to the alleged offence. The county commissioners have a clerk, and are required by law to keep a record or memorandum in writing of their acts including the granting of licenses. This proof is equally accessible to both parties, the negative averment can be proved with great facility, and therefore, in conformity to the general rule, the prosecutor ought to produce it before he is entitled to ask a jury to convict the party accused·" And to the same effect are *Com.* v. *Samuel*, 2 Pick. 103; *Cheadle* v. *State*, 4 Ohio, St. 477; *Mehan* v. *State*, 7 Wis. 670.

The introduction of the game-law exception in prosecutions upon the liquor laws of this state, brought to them an unnecessary odium. Its application to them was vastly more arbitrary than its original invention. It relieved the state from proving an essential averment of the indictment, when it not only did not appear to be impracticable for the state to prove it, but when it did appear to be at least as easy for the state to summon the town clerk, as for the defendant to summon witnesses (of whom the town clerk would naturally be one) to prove the signatures and authority of the selectmen. Even if it were a little more difficult for the state to furnish the proof than for the defendant to furnish it, it is not by a trifling difference between two inconsiderable difficulties of proof, that the general rule of the burden of proof can be set aside, and an exception established. *Cheadle* v. *State*, 4 Ohio State. 477, 480.

Upon an indictment for hunting deer, or catching fish, or cutting trees, or concealing a slave, without the consent of the owner, the burden is on the government to prove that the defendant was not licensed by the owner. *Rex* v. *Rogers*, 2 Camp. 654; *Rex* v. *Allen*, 1 Moo. C. C. 154; *Rex* v. *Corden*, 4 Burr. 2279; *Rex* v. *Hazy*, 2 C. & P. 458; *State* v. *Woodly*, 2 Jones, N. C. 276. And in other cases, the state is constantly required to prove a formal negative when the difficulty of proving it, is very great, and the difficulty of disproving it, would be very slight. On an indictment for illegal voting, the state must allege that the defendant was not qualified to vote; and, whether the alleged disqualification be a general incapacity to vote in any part of the state, or a special incapacity to vote in a particular town, the state must prove it, although the negative averment is peculiarly within the defendant's knowledge. *State* v. *Marshall*, 45 N. H. 281: *Com.* v. *Bradford*, 9 Met. 268, 271. Why should the burden of proving a qualification to sell liquor, be on the defendant, and the burden of proving a disqualification to vote, be on the state? In prosecutions in which it is an essential part of the

state's case that the defendant was never accoupled in lawful matrimony with a certain woman, the state has the burden of proof, although there is no more legal presumption than there is in a liquor case, and although the subject-matter of the " negative averment" is peculiarly within the defendant's knowledge. If he could have been married only in the town in which his alleged offence was located, the difficulty of proof, on the part of the state, would ordinarily be greater than the difficulty of summoning the town clerk to prove that a defendant was not authorized to sell liquor. But he may have been married in any town in the state ; in any town in the United States ; in any accessible part of the earth or sea ; and yet the state is not relieved from the burden ot proof by the immensity of the difficulty.

On an indictment for obtaining goods by false pretences, alleging that the defendant falsely pretended that a certain state of facts existed, as that his wife was dead, that he was in possession of certain goods, or of a certain certificate, or a license to sell liquor, and alleging that his wife was not dead, that he was not in the possession of the goods, or certificate, or license, the " negative averment" peculiarly within his knowldge, does not change the burden of proof. And so it is on indictments for perjury. Under the game laws, the defendant's rank and fortune, pedigree and property, were claimed, in 1816, to be so peculiarly within his knowledge as to change the burden of proof. But when a man is indicted for perjury in swearing to his pedigree, ( *Campbell* v. *The People*, 8 Wend. 636, 637) or property, the burden of proof as to " a negative averment" on that point is not changed. If a man is indicted for perjury in swearing to his pedigree to obtain property by will or descent, or in swearing to his property in justifying bail (Wharton Prec. 289, 290) the state is not entitled to a verdict on proof of his having sworn as alleged in the indictment ; the state must go further and disprove the things which it was held in *King* v. *Turner*, the defendant must prove. This condition of the authorities agrees with the inordinate importance formerly attached, by the ruling class of England, to the protection of the game. But if it be claimed that the true basis of *King* v. *Turner*, is the difficulty of proving " a multitude of facts," then it must be admitted that the apotheary's case and the liquor cases have no such basis.

On an indictment against selectmen, upon Gen. St. ch. 33, sec. 11, for inserting on the check-list the name of a man when they knew that he was not a legal voter, the defendants are not proved guilty beyond all reasonable doubt by reading the indictment to the jury. The state must produce some evidence, although there is a verbal negative in the indictment, and although the gist of the indictment is, that the negative was within the knowldge of the defendants. When they could not testify, it might be as difficult for them, as for the state, to prove what was peculiarly within their knowledge. And now, although they may testify, their omission to do so, is not evidence against them. There is nothing talismanic in the terms

" a negative averment peculiarly within the knowledge of the other party." Why is not the fact of the subject-matter of an averment being peculiarly within the knowledge of the other party, as important when the averment is a verbal affirmative, as when it is a verbal negative? A disparity in the proofs accessible on the one side and the other, is important as affecting the weight of the evidence produced, and the weight of the evidence which consists of the non-production of evidence. But how does the disparity depend upon the form of words used in pleading?

In case for deceit in the sale of a colt,—the plaintiff alleging, in his declaration, that the colt was not sound, and that this fact was within the defendant's knowledge,—if the defendant had always had the colt in his possession before the sale, and if the soundness before the sale, and the defendant's knowledge of that soundness, are peculiarly within his own knowledge, and if he is present at the trial, and does not testify, and his silence is weighty evidence against him, yet all this does not change the burden of proof; the plaintiff is not entitled to a verdict unless the jury find, upon the evidence produced and the evidence which consists of the non-production of evidence, that it is more probable than otherwise that the declaration is true.

The game-law exception has been applied in but very few classes of cases ; the number in which it could as well be applied as in those few, is very great. 1 Ben. & H. Lead. C. C. 308–317. It ought to be extended or extinguished. Its present position cannot be sustained. In its partial operation, it is a mere exercise of arbitrary power, destructive of the congruity and unity of the law.

By statute 13 Eliz. c. 12, s. 3, it was enacted that every person admitted to a benefice with cure of souls, should, within two months after his induction, publicly read the XXXIX Articles in his church in the time of common prayer, with declaration of his unfeigned assent thereunto, and should be, upon default, *ipso facto*, immediately deprived. In *Monke* v. *Butler*, 1 Rol. 83, Monke brought a suit, in the spiritual court, for tithes, against Butler who pleaded that the plaintiff had not read the XXXIX Articles according to the statute ; and the spiritual court put the defendant to prove this negative. But the defendant claimed that it was impossible to produce men to testify that the plaintiff never read the articles, because there was no man who had been at all the daily, morning and evening prayers ; and for this cause the defendant asked a prohibition from the King's Bench ; but it was denied. Coke, Ch. J. and Doderidge, J. held. that the law presumed that the plaintiff read the articles, because nobody would suppose that a man would lose a benefice rather than read the articles, and when the law presumes the affirmative, the negative must be proved, as if never accoupled in lawful matrimony, is pleaded, this negative must be proved. And Coke said if such a matter should come before him upon evidence, he would presume (until it were proved to the contrary) that the plaintiff read the articles.

This case of *Monke* v. *Butler*, was an ecclesiastical cause brought

in an ecclesiastical court, whose jurisdiction was derived, at one time, from the pope, and, at another time, from the king, as the temporal head of the English church, and whose system of pleading, evidence and practice was originally derived from the canon law. A common-law question of the burden of proof, receives no light from that quarter. It does not appear whether the defendant's plea was regarded as a traverse of an essential affirmation of the plaintiff, or as a plea in confession and avoidance, or discharge; nor does it appear that the spiritual court appreciated common-law distinctions of that kind. It was not strange that an ecclesiastical tribunal, created and conducted in the interest of the clergy, should, in a matter of tithes, in the early part of the seventeenth century, put a layman to prove a negative. In the King's Bench no reference was made to the common-law rule which affixes the burden of proof to the affirmative, but the question was decided by a presumption. The dividing line between presumptions of law and presumptions of fact, was not observed in the common-law courts; in the spiritual court, in which the cause was tried, there was no jury, and no occasion to distinguish between law and fact. The presumption stated by the King's Bench was a presumption of fact. Whatever might be supposed by a spiritual bench, weighing the evidence and the probabilities of the case, and deciding the fact, without a jury, the common law does not suppose that a parson would, or would not, prefer to read the XXXIX Articles, rather than lose his benefice, or that he had, or had not, been prevented from reading them, and declaring his unfeigned assent thereunto in his church, by the destruction of the church, or by sickness, forgetfulness, or conscience. The case, the tithes, and the court in which they were demanded, signify an era of sacerdotal power, benefit of clergy, and multifarious clerical exemptions and privileges, when the church was supreme in the state, and the priest was supreme in the church. The decision of the secular court, favoring the domination of the clergy in such a period, may be attributed to the overwhelming ecclesiastical influence in which the subjects of the ecclesiastical kingdom were born and bred.

The defendant, in that case, claimed that it would be so easy for the plaintiff to prove that he had read the Articles, and so difficult for the defendant to prove by "a multitude of facts" that he had not, that the burden of proof should be laid on the plaintiff. But the tithe-payer was resisting a privileged class who were helped by a dispensation called a presumption. The common people, prosecuted for killing game, also resisted a privileged class; but the presumption which relieved the clergy, would have put the burden of proof on the game-killing aristocracy in their prosecutions of the lower orders, and in their cases, instead of the presumption, an exception was employed. The means were various and conflicting; the result was uniform: the powerful were relieved of the burden of proof, at the expense of their inferiors in rank, fortune and influence. Such things as these, our emigrant ancestors intended to leave behind them when they came to New Hampshire. An English misunder-

standing or perversion of the common law, is not necessarily our law. And if there is any part of the common law incompatable with our institutions, or not adapted to our circumstances, it does not prevail here. *Eustis* v. *Parker*, 1 N. H. 273, 278; *Houghton* v. *Page*, 2 N. H. 42, 44; *Pettingill* v. *Rideout*, 6 N. H. 455; *State* v. *Rollins*, 8 N. H. 550; *Pierce* v. *State*, 13 N. H. 542; *Currier* v. *Perley*, 24 N. H. 223; *Dennett* v. *Dennett*, 43 N. H. 502; *Com* v. *Green*, 17 Mass. 533; *Going* v. *Emery*, 16 Pick. 107, 115; *B. & W. R. R.* v. *Dana*, 1 Gray 96–100; *Williams* v. *Williams*, 4 Seld. 525, 541; *Pawlet* v. *Clark*, 9 Cranch 292, 333; *Van Ness* v. *Pacard*, 2 Pet. 137, 144; Belknap Hist. N. H. under date of May 10, 1773; 1 Kent Com. 472, 473; Cooley Const. Lim.

If the burden of proof can be shifted by a contrast between difficulties of proof, there are strong reasons for holding that it can only be done by an extreme inconvenience amounting substantially to impracticability on one side, and by an extremely small inconvenience on the other. Whether there is any necessity for such an exception, and whether it can be expressed with precision in a legal formula, we are not now called upon to determine. The exception, as now expressed in the authorities, is one which it would not be useful to extend; and it cannot be applied to the present case, because it does not appear that the proof in relation to the assessment or payment of taxes, was so peculiarly or exclusively in the power of the defendant, as to require the defendant to produce it. If the books or officers of the town were needed to prove assessment or payment of taxes, it does not appear that the plaintiff could not easily produce them.

The instruction which relieved the plaintiff of the burden of proving payment of all taxes assessed, and put upon the defendant the burden of proving assessment of taxes, was erroneous, and for this cause there must be a new trial.

V. Should the new trial be of that part of the case in the former trial of which there was error, or of the whole case?

Several questions of fact have been tried and decided by the jury. In the trial of the question whether Isaac paid all taxes duly assessed, there was error; all the other questions were correctly tried. Is the correct trial of all the other questions invalidated by the mistrial of a single question? Is the right decision of all the other questions nullified by the erroneous decision of one? If the error had affected the trial and decision of two of the questions, to the prejudice of the defendant, it would be necessary to try those two again, in order to correct the error; if the error had affected four of them, it would be necessary to try four again; if it had affected all of them, it would be necessary to try them all again. But the error in the trial of the question whether Isaac paid all taxes duly assessed, did not affect the trial of any of the other questions. And there is no practical difficulty in granting a new trial of the question that has been erroneously tried, without disturbing the verdict. If, on the new trial of that question, the verdict should be for the plaintiff,

judgment could be rendered for the plaintiff, for the damages assessed in the first verdict; if the verdict should be for the defendant, judgment could be rendered for the defendant; in either case, the record of the judgment would recite all the proceedings that produced the result.

The general principle of the correction of errors which occur in judicial proceedings, preserves, as far as possible, what is good, and destroys only what is erroneous when the latter can be severed from the former, and destroys no more of the good than is necessary in the process of rectification.

On the reversal of a judgment, this court proceeds to give such judgment as should have been given. Gen. St. ch. 189, sec. 13; *Burt* v. *Stevens*, 22 N. H. 229; *Eames* v. *Stevens*, 26 N. H. 117–124; *Trow* v. *Messer*, 32 N. H. 363; *Fabyan* v. *Russell*, 39 N. H. 399. On a writ of error, when a judgment for damages and costs, is found to be erroneous in respect to the costs, the judgment is affirmed for the damages, and nominally reversed as to the costs, and a correct judgment for costs is rendered (*Eames* v. *Stevens*, 26 N. H. 117, 124; *Wells* v. *Fowler*, Kirby 236), all which amounts simply to an amendment of the original judgment. A judgment may be affirmed as to the costs, and reversed as to the damages. *Cummings* v. *Pruden*, 11 Mass. 206. When costs are limited by statute, to the amount of damages recovered, and a judgment is erroneous in being for more costs than damages, it is reversed "only as to that part which was illegal, viz: all the costs over the sum of the damages." *Dixon* v. *Pierce*, 1 Root 138. When a judgment is reversed for error in the damages, and a correct judgment for damages is rendered, (*West* v. *Whitney*, 26 N. H. 314), or when a joint judgment against two defendants is reversed and a judgment is rendered against one of them, (*Burt* v. *Stevens*, 22 N. H. 229), this formal circuity is really nothing more than an amendment of the original judgment. If there are two errors in a judgment, and one of them practically remedies the other, the judgment is affirmed. *Chamberlain* v. *Sterling*, 26 N. H. 116. When the plaintiff has a verdict and judgment for a greater sum than the damages claimed in his declaration, the error may be corrected by *remittitur* after joinder in error. *Usher* v. *Dansey*, 4 M. & S. 94; *Hubert* v. *Hardenberg*, 5 Halst. 222; *Hutchinson* v. *Crossen*, 10 Mass. 252. If substantial error in a judgment can be corrected without destroying the judgment, why should not error in a verdict be corrected without destroying the verdict? If the wrong parts of a judgment can be made right, without losing the good parts, why is a verdict incapable of a similar rectification?

The general principle of preserving the good, and destroying the bad, applies to the correction of errors in trials and verdicts, as well as to errors in judgments. If the verdict is wrong in giving too large damages, this error does not vitiate the verdict when the excess can be ascertained so that the bad may be severed from the good. The bad may be cut off by a *remittitur*, and the verdict saved. *Pierce* v.

*Wood*, 23 N. H. 519, 534; *Willard* v. *Stevens*, 24 N. H. 271; *Daniels* v. *Brown*, 34 N. H. 454, 549; *Cross* v. *Wilkins*, 43 N. H. 332; *Cram* v. *Hadley*, 48 N. H. 191. If, on a writ of entry, the verdict is erroneous in giving the plaintiff too much land, the error may be corrected in the same way. *Odlin* v. *Gove*, 41 N. H. 465, 478. If on a writ of entry, the jury find for the plaintiff as to a part of the demanded premises, and for the defendant as to the rest, and allow the defendant a certain sum for betterments, and there was error in the exclusion of evidence offered by the plaintiff on the question of betterments, the error may be corrected by the defendant remitting the betterments. *Wendell* v. *Moulton*, 26 N. H. 41, 66. It is not unusual to direct the jury to find their verdict separately for different parts of the damages, so that, the parts being severable on the face of the verdict, an error may be cured by a *remittitur*. *Madrazo* v. *Willes*, 3 B. & Ald. 353; *Willard* v. *Stevens*, 24 N. H. 271; *Taylor* v. *Railway*, 48 N. H. 308; *Deming* v. *Railroad*, 48 N. H. 463; *Woodman* v. *Nottingham*, 49 N. H. 384; *Willey* v. *Paul*, 49 N. H. 398. But it is not necessary that the parts should be stated separately in the verdict. If the court instruct the jury that the measure of damages is the whole value of of certain property, when the true measure is one half of the value, the error may be corrected by remitting one half of the damages given in the verdict. *Daniels* v. *Brown*, 34 N. H. 454, 459. The enquiry is into the practical separability of the substance of the verdict; whether its form of words can be separated is immaterial. On the material question of damages, a verdict being good in part and bad in part, the error is corrected without destroying the verdict, when separation is practicable. If all of a verdict except a portion of the damages, can be saved, why cannot all of the verdict in this case, be saved, except the part which finds payment by Isaac of all taxes duly assessed? That part is as distinct, and as easily severed from the rest, as was one undivided half of the damages in *Daniels* v. *Brown*.

In all cases of error cured by *remittitur*, there is, on the record, an erroneous verdict not set aside, reversed, or annulled; and that bad verdict is the foundation of a good judgment, the record showing how the effect of the error was obviated. What difference whether the error is in the damages or in some other part of the verdict, or whether the error is cured by a *remittitur* or a new trial? When an error is practically obviated, it becomes theoretical and harmless, and affords no ground of complaint. An error in instructions concerning nominal damages, is practically obviated by a verdict giving $200 damages. *Eastman* v. *Co.* 44 N. H. 143, 159. For the same reason, a verdict is not set aside for the admission of incompetent evidence when the verdict is rendered on such grounds as render the evidence immaterial ( *Wakefield* v. *Alton*, 3 N. H. 378; *Chamberlain* v. *Davis*, 33 N. H. 128; *Watson* v. *Walker*, 33 N. H. 145; *Currier* v. *B. & M. R. R.*, 34 N. H. 507), or when the evidence becomes competent after it is introduced. (*Lyford* v. *Thurston*, 16 N. H. 405; *Eastman* v. *Co.*, 44 N. H. 153), or when the evidence, after

it is admitted, is excluded so that the party objecting, is not prejudiced by it (*Hamblett* v. *Hamblett*, 6 N. H. 345–348; *Deerfield* v. *Northwood*, 10 N. H. 269; *Judge of Probate* v. *Stone*, 44 N. H. 607), or when the error is practically corrected, or the effect of it is practically obviated, in any other manner (*Wiggin* v. *Damrell*, 4 N. H. 74; *Morrill v. Richey*, 18 N. H. 298; *Knowles* v. *Dow*, 22 N. H. 411; *Foye* v. *Leighton*, 24 N. H. 38; *Edwards* v. *Evans*, 3 East 451). "It would be trifling with the technicalities of the law, and wholly perverting their use, to suffer an error which cannot possibly have had an influence in producing a verdict, to be made the occasion of setting it aside." *Morrill* v. *Richey*, 18 N. H. 298.

In trespass, where not guilty and a justification are pleaded, and the issue on the former plea is found for the defendant, the verdict is not set aside on the plaintiff's motion for improper rejection of evidence relating to the other issue. *Pierce* v. *Myrick*, 1 Dev. 345. If there are several issues, and a verdict on all for either party, and an error in the trial of one of them, a new trial is not granted if the party having the verdict consents that a verdict be entered for the other party on the issue in the trial of which there was error. *Hughes* v. *Hughes*, 15 M. & W. 701; *Fletcher* v. *Marshall*, 15 M. & W. 755, 764; *Baxter* v. *Nurse*, 6 M. & G. 942.

An error that does not harm the party objecting, does not harm the verdict. *McKean* v. *Cutler*, 48 N. H. 375; *Luey* v. *Bundy*, 9 N. H. 298, 304; *Fowler* v. *Tuttle*, 24 N. H. 9, 20; *Kingsley* v. *Holbrook*, 45 N. H. 323; *Graves* v. *Graves*, 45 N. H. 324; *Litchfield* v. *Londonderry*, 39 N. H. 247; *G. Bank* v. *Woodward*, 5 N. H. 301, 309; *Dame* v. *Kenney*, 25 N. H. 318, 325; *Carter* v. *Beals*, 44 N. H. 413; *Jewett* v. *Stevens*, 6 N. H. 80; *Hamblett* v. *Hamblett*, 6 N. H. 342; *Whipple* v *Stevens*, 22 N. H. 226; *S. M. Co.* v. *Walker*, 22 N. H. 466; *S. Dist.* v. *Bragdon*, 23 N. H. 515; *Titus* v. *Ash*, 24 N. H. 331; *Cook* v. *Brown*, 34 N. H. 470; *Tucker* v. *Peaslee*, 36 N. H. 180; *Paye* v. *Parker*, 40 N. H. 64; Hilliard on New Trials, ch. 3.

These and other authorities show that an error is harmless in law, if, in fact, it is so corrected that the judgment is not founded upon, or influenced by, it. And the cases of curing defects by *remittitur*, and of entering a verdict on one issue for the party objecting, and *Whittier* v. *Varney*, 10 N. H. 304, and other cases cited in *McKean* v. *Cutler*, 48 N. H. 376, show that errors may be cured as well after verdict as before. The time when an error is obviated is immaterial; the only material point is, that it be obviated so that it shall not affect the judgment which is the conclusion that naturally follows from the premises of law and fact. *McKean* v. *Cutler*, 48 N. H. 374; *Fitzhugh* v. *Wiman*, 9 N. Y. 565, 570. The difficulty is the practical one of separating the unsound from the sound; and there is no difficulty of that kind in this case.

The same rule applies to other proceedings. When an award is good in part, and bad in part, the valid part is sustained when it can be separated from the rest, and the justice of the case requires it,

and the object of the submission can be accomplished. *Whitcher* v. *Whitcher*, 49 N. H. 176, 177. When an entire tax is illegally assessed, the court do not annul the whole, but leave such an amount as ought to have been assessed. *Perry's Petition*, 16 N. H. 48.

The general principle being clear and well-settled, that, in the correction of errors, no more is destroyed than is practically necessary, what ground is there for a peculiar and exceptional practice when an error is to be corrected by a new trial? In *Winn* v. *C. Ins. Co.* 12 Pick. 279, 288, it was held that a new trial may be granted in order to determine a particular point, or to correct a particular error in the former trial, without opening the whole case. Shaw, Ch. J., delivering the opinion, said, " There are many cases so situated, that it would be highly proper to grant a new trial as to a particular point, or for the purpose of correcting a particular error or mistake. *Hutchinson* v. *Piper*, 4 Taunt. 555. This is analogous to the case of judgments, awards and other legal proceedings, good in part and bad in part, where the court will, if the position of the cause will admit of it, preserve that which is good, and correct that only which is erroneous." In *Sprague* v. *Bailey*, 19 Pick. 436, 442, the plaintiff's motion to set aside the verdict and order a new trial, was " so far granted as to open the single fact, whether the collector was duly sworn as such collector for the year 1834." In *Robbins* v. *Townsend*, 20 Pick. 345, 351, the decision was : " The evidence was incompetent and ought not to have been admitted, and for this cause, a new trial must be granted. But there having been a full and legal trial on the merits as to the other parts of the case, and the question of the appointment of the plaintiff as master of the house of correction, being entirely disconnected with the other questions raised, and one which in no way could have had any influence upon the finding of the jury upon those questions, the new trial is limited to this particular point. In cases like the present, substantial justice may be done without disturbing the verdict generally, by submitting to a new jury the question in reference to which, evidence was erroneously admitted."

" As the only exception, which is sustained, relates to the proof of the execution of the bond, the court are of opinion that this is one of those cases where the new trial should be confined to the point, whether the bond was duly executed, and that the issue to the jury, on the new trial, should be on that fact only. * * * If that fact is found for the plaintiffs, they will be entitled to a general verdict ; otherwise, a general verdict will be returned for the defendants." *A. Bank* v. *Root*, 2 Met. 522, 542. " As it is desirable that this vexatious litigation should end within some reasonable period, and as the only exception sustained concerns the defendant Hurlburt only, and has a bearing upon a single ground of his defence, we do not think it necessary or proper to order a new trial, except upon the condition that it shall be confined to the single issue of Hurlburt's competency to contract at the time he signed the agreement as surety to Bissell. If Hurlburt elects a new trial upon this point, he is

entitled to it; otherwise there must be judgment upon the verdict." *Hubbell* v. *Bissell & a.*, 2 Allen 196, 201.

In *Seccomb* v. *P. Ins. Co.*, 4 Allen 152, 153, 156, a new trial was granted on the single question " whether Smyrna, in a commercial sense and by commercial usage, was a port in Europe." A new trial is of the question of damages only, if exceptions which are sustained, relate to that question only. *Boyd* v. *Brown*, 17 Pick. 453, 461; *Ryder* v. *Hathaway*, 21 Pick. 306, 307; *Dyer* v. *Rich*, 1 Met. 192; *Kent* v. *Whitney*, 9 Allen 62, 65. In the latter case, the court said, " although the evidence offered by the defendant, was erroneously rejected, we are of opinion that he is not entitled to a new trial of the whole case. The evidence which the court refused to admit had no bearing whatever on the title to the property in question, or its conversion by the defendant. These questions have been settled by the verdict of the jury, under rulings to which no exception has been taken, and they ought not to be again opened. * * * The evidence rejected had reference solely to the question of damages, and justice will therefore be done by entering the order, *exceptions sustained; new trial as to damages only.*

" The damages appear to be excessive, and therefore a new trial should be granted to retry that question only." *Finch* v. *Rrown*, 13 Wend. 601, 605.

A new trial " may be granted as to one or more causes of action, * * * and refused as to others." *Woodward* v. *Horst*, 10 Iowa 120; *Dawson* v. *Wisner*, 11 Iowa 6, 8. In the former case the court said, " The plaintiff claims that, the verdict being set aside as to part of the demand, it should have been as to all. We do not think that he could demand this as a matter of right. * * * The jury found properly that this plea was sustained as to one count, but erred in their finding upon the second count. What purpose is to be gained then by awarding a new trial as to a part of the case not necessarily depending upon, or connected with, the other, and which has already been once properly decided?" In that case, on one plea and one issue there was a new trial of a part of the issue. In the present case, the question on which there was a mistrial, is as separable from the other questions involved in the issue, as one count is from another. Their divisibility is a practical, not a theoretical, matter.

The same practice prevails in South Carolina and Alabama. The court may " limit the inquiry on the new trial to the single point about which there is ground for complaint." *Laney* v. *Bradford*, 4 Rich. 1; *Walker* v. *Blassingame*, 17 Ala. 810; *Edwards* v. *Lewis*, 18 Ala. 494. In the latter case, it was suggested that if a new trial were granted of part of the case after judgment, the judgment if it were allowed to remain, might be pleaded at the new trial. But, in our practice, as the judgment would have been rendered after plea, and not since the last continuance, how could it be pleaded without leave? Moreover, the new trial being a review in part, designed to correct a judgment decided to be erroneous, a plea of the judgment,

would appear, by the record, to be a plea of an erroneous judgment. And the new trial, by necessary implication from the terms of the record, would be of one or more specified questions on the issues already joined, unless leave were granted to amend the pleadings. *Price* v. *Severn*, 7 Bing. 402. In *Wood* v. *Gunston*, Style 466, decided in 1655, a new trial was granted, "judgment to be upon this verdict, to stand for security to pay what shall be recovered upon the next verdict." And in 1798, that case was approved in *Pleydell* v. *Dorchester*, 7 T. R. 529. In systems of practice like ours, where motions for new trials are made before judgment, we are not aware that any practical objection has been raised against granting a new trial "as to one item in controvery, or even as to part of the sum recovered by the verdict on an entire cause of action," the judgment awaiting the final verdict. *Edwards* v. *Lewis, supra.* Every objection that has been brought to our notice, is purely technical.

*Bond* v. *Sparks & a.* 12 Mod. 275 (in 1700), was trespass against three defendants. "Two were acquitted, and *Sparks* found guilty; and it was certified by the Judge to be against evidence; and motion for a new trial. But the COURT said, a new trial could not be granted except against all." *Berrington's Case* 3 Salk. 362, (in 1707), was trespass against several defendants. The plaintiff had a verdict, " and it was moved for a new trial because as to one of the defendants the verdict was against evidence. *Sed, per curiam* this cannot be done, for the court cannot set aside the verdict as to some, and not as to others, and to grant a new trial as to all, would be a prejudice to those who are duly acquitted." But this obstruction has been removed from the course of justice. *Price* v. *Harris & a.*, 10 Bing. 331; *Green* v. *Elgie*, 5 Q. B. 107.

The entire practice of granting new trials, is an innovation which has grown up gradually. *Bright* v. *Enyon*, 1 Burr. 393, 394; *Witham* v. *Lewis*, 1 Wils. 55; *Beardmore* v. *Carrington*, 2 Wils. 248; *Duberley* v. *Gunning*, 4 T. R. 654; Quincy Mass. Rep. 558, 560; *Miller* v. *Baker*, 20 Pick. 289; *Wendell* v. *Safford*, 12 N. H. 175, 177; *Pierce* v. *State*, 13 N. H. 559. The ancient forms of process and procedure have been remodelled piecemeal by the courts. When a practice has thus been for ages undergoing improvement and reform, its history cannot be expected to be an exhibition of symmetry, regularity and order, and its precedents are to be taken with the allowance made for the ancient authorities of the progressive sciences. In the middle of the seventeenth century " it was clearly held for law, that whatever matter was of force to avoid a verdict, ought to be returned upon the *postea*, and not merely surmised by the court; lest posterity should wonder why a new *venire* was awarded without any sufficient reason appearing upon the record. But very early in the reign of Charles the Second, new trials were granted upon *affidavits;* and the former strictness of the courts of law, in respect of new trials, having driven many parties into courts of equity to be relieved from oppressive verdicts, they are now more liberal in granting them : the maxim at present adopted being this,

that (in all cases of moment) where justice is not done upon one trial, the injured party is entitled to another. Formerly the principal remedy, for reversal of a verdict unduly given, was by writ of *attaint* * * * which is at least as old as the institution of the grand assize by Henry II., in lieu of the Norman trial by battle. * * * But such a remedy as this laid the injured party under an insuperable hardship, by making a conviction of the jurors for perjury the condition of his redress. The judges saw this; and therefore very early, even upon writs of assize, they devised a great variety of distinctions, by which an attaint might be avoided, and the verdict set to rights in a more temperate and dispassionate method. * * When afterwards attaints, by several statutes, were more universally extended, the judges frequently, even for the misbehaviour of jurymen, instead of prosecuting the writ of attaint, awarded a second trial; and subsequent resolutions for more than a century past have so amplified the benefit of this remedy that the attaint is now as obsolete as the trial by battle which it succeeded: and we shall probably see the revival of the one as soon as the revival of the other. And here I cannot but again admire the wisdom of suffering time to bring to perfection new remedies, more easy and beneficial to the subject, which by degrees, from the experience and approbation of the people, supersede the necessity or desire of using or continuing the old." 3 Bl. Com. 388, 389, 390.

The process of new-modelling the forms used in correcting the errors of trials and verdicts, has been as slow, and, unless it is stopped, in vioalation of all precedent, will be as sure, as the change in the forms of action, described by Blackstone. "When therefore, by the gradual influence of foreign trade and domestic tranquility, the spirit of our military tenures began to decay, and at length the whole structure was removed, the judges quickly perceived that the forms and delays of the old feudal actions (guarded with their several outworks of essions, vouchers, aid-prayers, and a hundred other formidable intrenchments) were ill suited to that more simple and commercial mode of property which succeeded the former, and required a more speedy decision of right, to facilitate exchange and alienation. Yet they wisely avoided soliciting any great legislative revolution in the old-established forms; * * * but left them as they were, to languish in obscurity and oblivion, and endeavored by a series of minute contrivances, to accommodate such personal actions as were then in use, to all the most useful purposes of remedial justice; and where, through the dread of innovation, they hesitated at going so far as perhaps their good sense would have prompted them, they left an opening for the more liberal and enterprising judges who have sat in our courts of equity, to show them their error by supplying the omissions of the courts of law. * * * Our system of remedial law resembles an old Gothic castle, erected in the days of chivalry, but fitted up for a modern inhabitant. The moated ramparts, the embattled towers, and the trophied halls, are magnificent and venerable, but useless, and therefore neglected. The

inferior apartments, now accommodated to daily use, are cheerful and commodious." 3 Bl. Com. 237, 268.

The difficulty in *Bond* v. *Sparks & a.* was the imaginary indivisibility of the verdict. It was erroneously supposed, when there was a verdict against several defendants, that its inseperable nature prevented a new trial as to a single defendant. That difficulty now seems frivolous and visionary, but it was once a serious obstacle. And when it was overcome, a sufficient precedent was made for overcoming similar obstructions. The whole difficulty being one of the practical seperability of the verdict, when any question or fact can practically be separated from other questions or facts, as easily as the liability of one defendant can be separated from the liability of other defendants, why should we refuse to follow the precedent to its logical conclusion? Although it was once a novelty, we follow as far as the letter of it goes. Why should the spirit of it be disregarded? When, and by what authority, did the ancient judicial duty of restoring and establishing the substance and elementary principles of the law in the place of formula and ceremonial, come to an end?

The difficulty of *Bond* v. *Sparks & a.*, was finally overcome, in other cases, by earnest efforts and a liberal and enterprising spirit such as Blackstone was accustomed to warmly commend as worthy of imitation. In *King* v. *Mawbey & a.*, 6 T. R. 619, 622, 638, (in 1776), there was manifested a readiness to fit old legal forms to the natural shape of the legal principle of correcting errors by saving what is good and destroying only what is bad. In that case, four defendants were indicted for a misdemeanor, two were acquitted, and two, who were found guiltly, moved for a new trial. "But upon that occasion the court suggested a difficulty whether a new trial could be granted as to some of the defendants on the record, and not as to others." After elaborate argument, the judges delivered their opinions. "Lord Kenyon Ch. J. It was contended on behalf of the prosecutor that, as two of the defendants had been acquitted, the record could not be sent down again to another trial without putting their guilt or innocence again into a state of inquiry, and that inasmuch as defendants who have been acquitted in criminal cases, cannot be tried a second time, the necessary consequence was, that in this case, we could not grant a new trial, even though we were clearly of opinion that the other two defendants had been improperly convicted. * * * But I think that the rule was correctly stated by the counsel for the defendants, that in granting new trials, the court know no limitations, (except in some excepted cases), but they will either grant or refuse a new trial, as it will tend to the advancement of justice. In one class of offences indeed, those greater than misdemeanors, no new trial can be granted at all. * * * I have studiously gone out of the way in order to express my opinion on this point, an opinion formed on great deliberation, lest the public should be misled by the arguments used on behalf of the prosecutor, and imagine that manifest injustice must be effected in this case because the forms of law cannot yield to substantial justice.

Ashhurst J. of the same opinion.

Grose J.  *  *  *  It is true that substantial justice does require it; and I have no doubt but that we may so mould the proceedings of the court as to effect that purpose.  *  *  *  *  *

Lawrence, J. From the instant it was admitted that a new trial might be granted in criminal cases where only one defendant is indicted, it seemed to me to follow as a consequence that we might grant a new trial in this case in favor of those who have been convicted, if they have been improperly convicted, unless the court were entangled in the strict forms of proceeding. Arguments drawn from civil cases, are not applicable to the present; because in those there is only one *venire* on the record and one assessment of damages; but that is not so in criminal cases. But the difficulty that struck me was, that as the first *venire* must appear on the record for the benefit of the two defendants who were acquitted, a second *venire* could not be awarded for the other two defendants who were convicted. Two modes were suggested in order to obviate this difficulty; the one was to alter the first *venire*; the other, to make an entry on the record that the verdict against two of the defendants was improperly given, and then to award a new trial as far as respected them. I do not know that the first mode is objectionable. In civil actions no notice at all is taken on the record, of the first *venire* when a new trial, is granted, and if we were to grant a new trial, in this case, in respect of two of the defendants, I see no objection to altering the first venire as to them, and to let it stand as to the other defendants, who were acquitted."

*Parker* v. *Godin*, Stra. 813, (in 1729,) was trover for plate. The question was, " what meddling with the effects of a bankrupt is a conversion." The verdict was for the defendant, and a new trial was granted. At the end of the report of the case is the following : " N. B. A difficulty arose upon the motion for a new trial, which was this. There were other things besides plate in the declaration, and as to them the verdict *pro def*, was right; and yet a new trial must be granted upon the whole. But on consideration the court held that could be no reason to refuse a new trial, for if the merits as to those other things were with the defendant, it would be found for him as to them. But it was agreed on all hands, that if one defendant be acquitted, and another found guilty, that defendant can have no new trial." This is an instance of the error of holding superstitiously to an imaginary technical indivisibility of a general verdict. Three joint defendants were so mysteriously connected that their union would not be dissolved by a verdict acquitting two and finding the other guilty; therefore " it was agreed on all hands," there must be no new trial at all. That was *Bond* v. *Sparks & a.;* decided twenty-nine years before. "Plate" and "other things" were inseparable; therefore " a new trial must be granted upon the whole." That was the conclusion of *Bond* v. *Spark & a.*, applied to "plate" and "other things." *Parker* v. *Godin*, was a mere application to chattles, of the mistake of *Bond* v. *Sparks & a.*

When the mistake has been abandoned, why should its application be continued.

In *Edie & a.* v. *E. I. Co.*, 1 W. Bl. 295, 298; S. C. 2 Burr. 1216, 1224, (in 1761,) the first count was on a bill of exchange which the defendant did not resist, and a verdict was taken upon it for the plaintiffs without objection. The second count was on another bill of exchange, and on this, a verdict was found for the defendant. On motion of the plaintiffs a new trial was granted for error in the admission of evidence relating to the second count. Lord Mansfield, in speaking of costs (often allowed as terms or conditions of a new trial), said, (as reported by Blackstone), "For form's sake we must set aside the whole verdict:"— (as reported by Burrow), "As to the costs—I think there should be none in this case. For the verdict must be set aside *generally*, not in part only. Yet this verdict is agreed to be right upon the *first* count: and that is found for the *plaintiffs*. Therefore there ought to be no costs upon granting a new trial in the present case : since the merits were *always* clear for the plaintiffs on the *first* count ; and it *now* appears that nothing remained to be tried on the *second*,"

According to Lord Mansfield, in the English practice, "the whole verdict" must be set aside "for form's sake." Since the radical change introduced in our practice by the decision of *Berry* v. *Osborn*, 28 N. H. 279, we are not bound, in such cases as this, to do injustice "for form's sake." That novel but sensible decision was, that the statute of amendments should no longer be distorted by the narrow construction which had repeatedly defeated the object of similar statutes in England, (*McKean* v. *Cutler*. 48 N. H. 376,) but should be construed by the natural and ordinary meaning of language. Under that decision, the provision of the statute that no proceeding shall be reversed for any error or mistake where the person or case may be rightly understood by the court, is to be understood to mean what the words signify in their natural and usual sense. And the erroneous parts of a verdict, when they can be practically separated from the rest, may be corrected, and the case may be rightly understood by the court, without destroying the whole verdict "for form's sake."

An information was exhibited against three, and a verdict against all three ; and a new trial granted as to *Fern*, because he had not sufficient notice given him, and this special cause entered upon the record, and judgment was against the other two. (*Fern's Case*, H. 27 & 28 Car. II. *tamen quaere*:) Yet the authority of this case may well be doubted, for where there were several defendants, and the verdict as to some was against evidence, yet the court would not grant a new trial, for they said the verdict must stand or fall *in toto*. *Collier* v. *Morris*, M. 1735. *Captain Crabb's* Case, M. 23 Geo. S. P. So where one issue out of four was against evidence, the court granted a new trial, not only as to that issue, (for that they said cannot be) but for the whole. *Rex* v. *Poole*, E. 1734." Bull. N. P. 326. In the argument of *King* v. *Mawbey & a.* 6 T. R. 627,

where counsel cited "*Rex* v. *Pool*, Bull. N. P. 326," "*Grose J.*
said he remembered a case tried some years ago at *Bristol*, where
a new trial was granted as to one issue out of several, which had
been found against the evidence."

The cases, *Bond* v. *Sparks & a.*, *Berrington's Case*, *Parker* v.
*Godin*, *Edie & a.* v. *E. I. Co.*, *Rex* v. *Pool*, and *King* v. *Mawbey
& a.*, were condensed by Tidd, thus : "A new trial cannot be granted
in *civil* cases, at the instance of *one* of several defendants ; nor for a
*part* only of the cause of action : And therefore, where one issue out
of four was found against evidence, the court granted a new trial,
not only as to such issue, for that they said could not be, but for the
whole.      *     *     *      In *criminal* cases, where several defendants
are tried at the same time for a misdemeanor, and some are acquitted,
and some convicted, the court may grant a new trial as to those con-
victed, if they think the conviction improper."      Tidd Pr. 819, 820.
Mr. Tidd's digest of these cases brings them together ; and they
belong together.      The cases of refusing a new trial to " *one* of sev-
eral defendants," and the cases of refusing a new trial on " a *part*
only of the cause of action," are of one class, embodying and
expressing one common idea, and they must stand or fall together.
We do not follow them in refusing a new trial to a defendant in tres-
pass, when his codefendants have been acquitted.      Why should we
follow them in refusing a new trial on a part of the matter in con-
troversy ?

In *Hutchinson* v. *Piper*, 4 Taunt. 555, tried in 1812 before Mac-
donald C. B. there were many counts, but the plaintiff's evidence was
ultimately restricted to the fourteenth.      The plaintiff was nonsuited
because certain proof was not given, but the chief baron reserved
the point on that single count.      It was held that the nonsuit must be
set aside.      " Mansfield Ch. J.      *     *     *      But the chief baron
certainly meant, by reserving the point, to confine the plaintiff only to
this one count.      Heath J.      If they are to go down on the same trial
of the same record, how are we to restrain them? Gibbs, J.      A
motion for new trial is not a matter of right.      If the chief baron
meant to give the plaintiff leave to move on that point only, he will
have only what is granted.      If a new trial be granted because a
judge has improperly nonsuited the plaintiff, I apprehend the
new trial must take place upon the whole record, not but that there
may be cases, in which the new trial may be restrained to a particu-
lar part of the record, as if the judge gives leave to move on a point
or part only, upon a stipulation understood, between the judge and
the counsel, that he shall not move on any thing else, or if on the
evidence, the court above thinks that justice has not been done, but
that they shall do more injustice by setting the matter at large again,
they may restrict the parties to certain points on the second trial ;
but where the plaintiff has been nonsuited on the misruling of the
judges, unless there be some agreement between the parties, we can-
not confine them.

Rule absolute for a new trial generally."

*Thwaites* v. *Sainsbury*, 7 Bing. 437, (in 1831,) was "Assumpsit for goods sold and delivered. Plea *non assumpsit.* At the trial, proof having been given of the sale and delivery of the goods, the defence set up was, that the plaintiff had subsequently received in full for his demand three bills of exchange accepted by Leigh Hunt, and Clarke; that he had taken these bills on his own risk, and had released the defendant from all responsibility in respect of them. This was the only question in the cause." The plaintiff obtained a verdict which *Spankie*, for the defendant, moved to set aside on the ground that it was contrary to the evidence. "The court proposed to grant a new trial, but to limit the inquiry to the single question, whether the plaintiff had agreed to take the bills on his own risk, expressly releasing the defendant from any responsibility. *Spankie*, Serjt., objected, that the court, in the exercise of its discretion as to granting a new trial, had seldom or never restricted a party in this way to a single point of inquiry; and he prayed to be allowed, as usual, to go to trial again generally, without restriction; but
*The court* observing, that in causes where the defence was set out in pleading, the parties would, on a second trial, be necessarily confined to the issues which were on the record at the first trial, and that it was expedient the same course should be pursued where a particular line of defence had been relied on under the general issue, imposed that condition on the defendant, and made his rule for a new trial absolute on the following terms: Payment of costs; bringing into court the money sought to be recovered; and limiting the inquiry on the new trial to the single point, whether the plaintiff had agreed to take the bills on his own risk, expressly releasing the defendant from any responsibility. In determining whether a new trial can be of one only of several questions involved in an issue, it must be immaterial whether the other questions were not actually raised, or were agreed, by the parties, or were properly found by the jury.

In *Bernasconi* v. *Farebrother & a.*, 3 B. & Ad. 372 (in 1832), it was held that certain evidence received on one point, was incompetent; and the party who had introduced the evidence, claimed that on a new trial, the inquiry should be restrained to that point. Lord Tenterden, delivering the judgment of the court, said, "We have considered also whether we could limit the inquiry upon the new trial to one point. In *Hutchinson* v. *Piper*, 4 Taunt. 555, Gibbs J. lays it down, that in certain cases of which he gives instances, a new trial may be restrained to one point. But in the particular case now before the court, the objection which arose as to the admissibility of the evidence, might have been taken by bill of exceptions. The application for a new trial was substituted for a bill of exceptions. Now, if there had been a bill of exceptions in this case, and the judgment were that the evidence had been improperly received, the court of error could only have awarded a *venire de novo*, sending the whole to a new trial: and as the application for a new trial is substituted for a bill of exceptions, we think that, by anology to that proceeding, the defendants are entitled to a new trial generally."

This opinion of Lord Tenterden and the other judges, is of great value as showing what objection there is, in England, to granting a new trial on a part of a case. Nothing was said of the imagined inseparable nature of a general verdict, but the sole difficulty was found in the old form of a *venire*, which is not used in granting new trials on motion. The difficulty of the *venire* was separated from the *venire*, and imported, by analogy into new trials granted on motion. The reasoning there employed suggests some arguments in favor of the conclusion that, in our practice, a new trial of part of a case only, may be granted.

1. When the King's Bench founded their decision on a ground so artificial and ideal as a difficulty of a *venire* not used in this proceeding, their omission to refer to other objections, has some tendency to show a scarcity of substantial difficulties. And if there could have been a *venire* in this case, we are unable to see why the court should be industrious and astute in taking from a *venire* any of its supposed difficulties, and using them in a proceeding in which there is in fact no *venire*, when their sole effect must be to embarrass and obstruct the course of justice. We should rather be inclined, if it were necessary, to follow the example of the judges who "devised a great variety of distinctions by which an attaint might be avoided and the verdict set to rights in a" better method. 3 Bl. Com. 389. Their authority may at least restrain us from unnecessarily bringing the difficulties of a *venire* into the present system of granting new trials on motion. In practice the present system has superseded the *venire*. Why not let it supersede the difficulties of the *venire?* Why substitute a motion, for a bill of exceptions unless the proceeding by motion is an improvement? Why take the trouble to introduce new machinery, if the inconveniences and defects of the old are to be attached to the new, and perpetuated by anology?

2. A *venire* is not inflexible, as has been supposed. It is spoken of as a form; but it has many forms, and, in the old practice, was used, actually or theoretically, on various occasions. And if the present proceeding were by the old route of exceptions, writ of error and *venire*, there would be no trouble in putting the *venire*, and every part of the record in a suitable form for trying a single point of the case. A court has as much power to construct a *venire* now, as the court who made the first precedent on the subject; and it is the duty of the court not to allow injustice to be done by antiquated forms of process and record. A *venire* is not law, but a mere subordinate piece of one of the numerous methods devised by the court for administering the law. Such methods cannot be allowed to gain ascendency over the law which they were designed to execute. The idea of a court being so fettered by forms fabricated by a court, that the general principles of the law cannot be administered, is preposterous. The general principle of the law, which in correcting errors, saves the good and destroys only the bad, is not defeated by want of judicial power to make any insignificant form of a *venire* that may be needed. In *King* v. *Mawbey & a.*, 6 T. R. 638–640,

the court struggled with the difficulties of a *venire*, and discovered that forms which courts had invented, courts could alter.

3. Another argument for granting a new trial on a part of a case in this state, was furnished by the King's Bench when they held that a new trial must be of the whole case because the objection to the evidence "might have been taken by bill of exceptions," and because, upon bill of exceptions, and writ of error, and reversal of the judgment, it was thought an unalterable *venire* would send the whole case to a new trial. Their decision was based on the single fact that there might have been a *venire*. In the present case, there could not have been a *venire*. Writs of error and *venire* are abolished in all cases in which there may be a bill of exceptions.* Gen. St. ch. 189, sec. 9–14. " We regard this statute as designed to change the practice of the court in regard to writs of error, and to substitute for them a more simple and expeditious mode of obtaining a final decision upon questions of law arising at the trial terms, thus limiting the occasion for writs of error to those cases where the party has no opportunity to take an exception at the time." *Peebles* v. *Rand*, 43 N. H. 337, 342. There is, therefore, no analogy of a possible *venire* to prevent a new trial on a single point. We need not be concerned " lest posterity should wonder why a new *venire* was awarded," (3 Bl. Com. 388), or why it was, or how it could be, awarded on a single question in this case, since we neither can, on this motion, nor could, on a bill of exceptions, leave any such *venire* for posterity to wonder at.

*Price* v. *Harris*, 10 Bing. 331, (in 1833) was case against seventeen defendants. Two were defaulted, and fifteen pleaded the general issue. The plaintiff entered a *nol. pros.* as to one of the two, and obtained a verdict against the other for 900 *l*; and the verdict was in favor of the fifteen. The plaintiff moved for a new trial as to five of the fifteen, on the ground that, as to them, the verdict was against evidence. A new trial was granted against one of the five. Tindal, Ch. J., delivering the opinion.

*Mahony* v. *Frasi*, 1 Cromp. & M. 325, (in 1833,) was trespass. The plaintiff obtained a verdict, and the defendant moved for a new trial on the ground of excessive damages. " The court intimating that there must be a new trial " on that ground, the plaintiff "prayed that the inquiry upon the new trial might be confined to that point, or at least, that the defendant might not be allowed to question the points on which the court thought the decision had been clearly right. *Sed per* Bayley, B.—If, in respect of circumstances which have occurred at the trial, it be a matter of right in any party to have a new trial, the courts cannot confine or limit the inquiry; where it is only a matter of indulgence they may.

Rule absolute for a new trial generally, on payment of costs."

In *C. K. Co.* v. *Rawlings*, 3 Bing. N. C. 71 (in 1836,) there

---

*See *Fowler & a.* v. *Towle, ante, 524.*

REPORTER.

were two issues and a verdict on both for the plaintiff. The judge rejected evidence bearing on the second issue, which should have been received, and, for that reason a new trial was granted on the second issue, but not on the first. The new trial was granted by Tindal, Park, Gaselee and Vaughan. Tindal, delivering the opinion of the court, said, " The cause, therefore, should go to trial again on that issue only on which the evidence has been rejected."

In *Morrison* v. *Harner & a.*, 3 Bing. N. C. 759, 764, (in 1837,) there were two issues, and a verdict for the defendants on the first, and for the plaintiff on the second. *Kelly*, for the plaintiff, moved for a new trial on the first issue. During the argument, Tindal, Ch. J., said, " Can you move for a new trial on one of several issues? I remember looking into the point, and could find no authority. How would you make up the record?" *Kelly* replied that in *Bower* v. *Hill*, 1 Bing. N. C. 549, the cause was sent down to a new trial on one only of several counts, and, in *C. K. Co.* v. *Rawlings*, 3 Bing. N. C. 71, on that issue only on which certain evidence had been rejected. The report of *Bower* v. *Hill*, does not show that the new trial was on one only of several counts, but the judgment in that case was delivered by Tindal, and he did not controvert the statement made by Kelly in regard to either of the cases.

*Stroud* v. *Stroud, Executor*, 7 M. & G. 417, was an action of debt. The defendant pleaded, first, that the testatrix was never indebted; secondly, payment; thirdly, *plene administravit*. The plaintiff had a verdict. A new trial was granted on the last issue, because the verdict was against the evidence; but the verdict on the first and second issues, was not disturbed. Tindal, Ch. J., said, " With respect to the first part of the case, I entertain no doubt but that it ought to rest where it is on the finding of the jury. *       *       *       *       With regard to the question arising on the plea of *plene administravit*, which I think has not been properly sifted, it seems to me that the case ought to go down to a new trial."

There is a large class of English authorities holding that a defect in a verdict cannot be supplied by a new trial of part of a case " because thereby the party may lose his action of attaint." *McKean* v. *Cutler*, 48 N. H. 373, and authorities there cited ; Bac. Ab. *Juries*, (M.), 1 ; *Kynaston* v. *Mayor*, Stra. 1052 ; *Gibson* v. *Brook*, Cro. Eliz. 860. How much influence this rule had against the practice of granting a new trial on a part of a case, we do not know. " Courts occasionally evince an undue tenacity for the old maxims and rules of the common law, when the reason of them has ceased ; and sometimes when new principles have been adopted by them, or have grown up with time, which are practically inconsistent with them." *French* v. *Marstin*, 24 N. H. 452. " As the remedy by writ of attaint does not exist here, it does not furnish a reason for refusing to correct the omission of damages, by a writ of enquiry, (Broom L. Max. 118,) and, upon application of the party injured by the omission, a court acting upon the common law, as amended by the abolition of the writ of attaint, might award a writ of enquiry—a process which would be

equivalent to a new trial on the single point in which there was error. * * * At common law, modified by the abolition of the writ of attaint, the damages could be ascertained by writ of enquiry, and the verdict which settled the title would not be set aside; in our practice, a formal writ of enquiry being unnecessary, *West* v. *Whitney*, 26 N. H. 314, 315; *Chase* v. *Lovering*, 27 N. H. 295,) the question of damages might be submitted to a jury without any supplementary writ, process, or pleading." *McKean* v. *Cutler*, 48 N. H. 373, 374, 375. That was one of the many occasions on which has been manifested a disinclination, in this jurisdiction, to increase the number of " cases where courts are found sticking to the form when the substance has departed." *French* v. *Marstin*, 24 N. H. 453.

As there were cases in which a defect in a verdict could not be supplied by a new trial of a single point on a writ of enquiry, because of the writ of attaint, so there were cases in which a defect in a verdict could be supplied in that manner, because there could be no writ of attaint. "Where the jury, upon the trial of an issue, omit to assess the damages, the omission may, in some cases, be supplied by a writ of enquiry." Tidd Pr. 516. Delivered as we are from all influence of the writ of attaint, we need not maintain distinctions founded upon it. And if an omission of damages in a verdict, can be cured by a new trial on that point alone, why cannot a defect on any other point be cured in the same manner?

Blackstone, after refering to the errors and defects which a new trial is designed to cure, says, " In granting such further trial, which is matter of sound discretion) the court has also an opportunity, which it seldom fails to improve, of supplying those defects in this mode of trial which were stated in the preceding chapter; by laying the party applying, under all such equitable terms as his antagonist shall desire and mutually offer to comply with : such as the discovery of some facts upon oath ; the admission of others not intended to be litigated; the production of deeds, books, and papers; the examination of witnesses, infirm or going beyond sea; and the like." 3 Bl. Com. 390–392. He puts the power of imposing terms, for amendments, and for new trials, (which are in truth but a species of amendment,) on the same ground. In his vehement denunciation of the ancient practice of refusing amendments, he says, " And, if it were feared that an amendment after trial might subject the jury to an attaint, how easy was it to make waiving the attaint, the condition of allowing the amendment !" 3 Bl. Com. 411.

*Edmondson* v. *Machell*, 2 T. R. 4, " was an action of trespass for assaulting and beating the plaintiff's niece, *per quod serviteum amisit.* The niece lived with her aunt * * * as her servant. There was another action " brought by the niece against the same defendant for the same assault." * * * The defendant's counsel contended that the jury could only give damages in this cause for the loss of service." But the court declined so to instruct the jury, and for that reason, the defendant moved for a new trial " on the ground of a misdirection to the jury." " After a question

put this day to the plaintiff's counsel whether the niece would enter into a rule not to proceed in the action in which she herself was plaintiff, which was answered in the affirmative :

ASHHURST, J. said, that the judges of this court had consulted with the rest of the judges on this case, and the result of their opinion was, without giving any positive opinion upon the question of law, that this rule ought to be discharged. An application for a new trial is an application to the discretion of the court, who ought to exercise that discretion in such a manner as will best answer the ends of justice. It does not require much penetration to see what are the ends of justice in the present case. It is certain that the girl herself ought to have some satisfaction for the injury she received; and as she consents not to try her action, the question is whether justice has not already been done; for it was admitted at the bar that, if the injury she sustained could be taken into consideration in this action brought by the aunt, the damages which the jury have given are by no means excessive. Then there does not appear to be any ground for the defendant to call on the discretion of the court to send this cause down to be retried on a technical objection in point of law. And all the judges are unanimously of opinion that, as complete and substantial justice has been done, there is no reason to grant a new trial. On the plaintiff's undertaking to pay over to the neice the damages after deducting the costs of this action, and on the neice's undertaking not to proceed in the action ·in which she herself was plaintiff.

*Rule discharged without costs.*"

That was the unanimous opinion of the King's Bench and all the other judges, in 1787, when Mansfield was chief justice. Higher authority cannot be desired.

In ·*Moore* v. *Tuckwell*, 1 M. G. & S. 607, an action of debt, decided in 1845, the plaintiff had a verdict for 4 *l.* 19 *s.* 9 *d.*, and *Shee*, Serj't., for the defendant, moved for a new trial on the ground of misdirection," And it was held that, as to one item of the plaintiff's claim amounting to 4 *l.* 5 *s.*, the jury had been misdirected. During the argument, Tindal Ch. J. said, " If, however, the plaintiff will consent to the verdict being reduced by the amount of 4 *l.* 5 *s.*—the sum to which alone the misdirection applies—I think justice will be answered without sending the cause down to a new trial.

*Shee*, Serj't, in support of his rule, insisted that he was, as a matter of right, entitled to a new trial, the verdict being the result of an erroneous direction of the judge; and that the court had no power to compel him to submit to the entering of a verdict different from that which the jury had found.

*Cur. adv. vult.*

TINDAL, C. J. now delivered the judgment of the court. This was a rule for a new trial, in a case tried before the judge of the sheriff's court, on the ground of misdirection, and upon no other ground. * * * Now the only misdirection being that which re-

lated to a separate cause of action amounting to 4 *l.* 5 *s.*, and the plaintiff's counsel on showing cause, having consented to abandon that sum altogether, we think the whole justice of the case, so far as we can look at it, has been attained by the plaintiff's consenting to reduce the damages, by the whole sum in respect to which such misdirection took place. It was objected, in argument, that the court has no authority to alter the verdict of the jury. We do not alter the verdict which still remains a verdict for the plaintiff with the same amount of damages, unless the plaintiff consents to such alteration : all that we do, is to secure to the defendant the option of paying 14 *s.* 9 *d.* only, instead of the sum recovered.　*　*　*
It is not the practice, as stated at the bar, that, in all cases where there has been a misdirection, a new trial must be granted *de jure* because a bill of exceptions might have been tendered ; for, where the court can see clearly that real and substantial justice has been done, or may be done, without a new trial, the rule has been refused ; see *Edmondson* v. *Machell*, 2 T. R. 4, and *Twigg* v. *Potts*, 1 C. M. & R. 89."

These authorities and many others illustrate the general principle that when an error has happened in a trial, the party prejudiced by it, has a right to a correction of the error, but has not a right to a new trial if the error can be otherwise corrected ; and when it can be corrected only by a new trial, it is still the correction of the error, and not the new trial, to which he is primarily entitled. The correction of the error, is the end ; the new trial is a means. There is no general rule that when there has been an error in a trial, the party prejudiced by it, has a legal right to a new trial. He has a legal right to a cure of the error, but not to his choice of the remedies. If a new trial is necessary, he receives it, not because it is a general right, but because it happens, in a particular case, to be the only available remedy. It is thus held in reserve as the last resort, because it is more expensive and inconvenient than other remedies ; an unnecessary new trial would be an unnecessary injustice and an unmixed evil. That is the theory of the common law. And so far as a new trial goes beyond the necessity of its use, so far it is an unnecessary injustice and an unmixed evil. That is but a branch of the general theory. And New Hampshire knows, by disastrous experience, that it is not a mere theory. We are not dealing with an abstraction. The general theory of the law, and all its analogies, its reason, and its justice, concur in the conclusion that a remedy, of whatever form, should be administered no farther and no longer than is necessary to effect a cure of the error to which it is applied. When the erroneous part of a case is cured, the general principles of our jurisprudence do not require the application of the remedy to other parts of the case which do not need it. When the remedy goes far enough to cure the error, the legal right of the complaining party to redress, is satisfied and exhausted, for his legal right is merely to have the error corrected. That is an elementary principle too well settled to be questioned. The only question is,

whether there is any sufficient reason for refusing to carry the principle into practice ;—whether a new trial ought to be, in practice, any thing more than it is in theory, an opportunity to correct the errors of a former trial.

The authorities are clear that in correcting an error happening in a trial, the law will impose terms and conditions when necessary for the purpose of saving the verdict, if, without setting it aside, the error can be practically obviated. And this is done when the error is an admission or rejection of evidence, or a misdirection to the jury, as well as in other cases. *Edmondson* v. *Machell*, 2 T. R. 4; *Moore* v. *Tuckwell*, 1 M. G. & S. 607; *Hughes* v. *Hughes*, 15 M. & W. 701; *Fletcher* v. *Marshall*, 15 M. & W. 764; *Baxter* v. *Nurse*, 6 M. & G. 942; *Pease* v. *Morgan*, 7 Johns. 468; *Whittier* v. *Varney*, 10 N. H. 304; *Pierce* v. *Wood*, 23 N. H. 534; *Willard* v. *Stevens*, 24 N. H. 277; *Daniels* v. *Brown*, 34 N. H. 459; and many other cases. The correction of error, being the object, terms and conditions may be employed as means to accomplish it. In the present case, no terms or conditions are necessary.

It is claimed by the defendant, in this case, that limiting a new trial to a single point, is an exercise of arbitrary power under the name of judicial discretion. This claim is based on the proposition that when there has been a mistrial there is a legal right to a new trial; and that proposition, as we have seen, is unsound. The defendant has a legal right to nothing more than a correction of the error of the former trial. It happens, in this case, that the error cannot be corrected without a new trial. Therefore, indirectly, secondarily, and consequentially, the defendant has a legal right to a new trial. A new trial of what? Upon every ground of legal principle, strict logic, common sense, and natural justice, the defendant has a legal right to nothing more than a new trial that will correct the error, the correction of which is all the defendant is entitled to; and such a new trial is of that part of the case only which contains the error. In granting a new trial of that part of the case, the defendant's right is not limited, but is maintained in its widest and fullest extent. Nor is the new trial limited; it does not first exist as a new trial of all the questions involved in the case; it is originally a new trial of one question, and it continues to be, without limitation, what it is at first. The plaintiff cannot complain, that, in this action, brought by the plaintiff as a remedy, other actions are not tried; and in a new trial of a question, granted to the defendant, as a remedy for an error in the former trial of that question, the defendant cannot complain that other questions are not tried; there is no restriction, but, on the contrary, there is in each of these instances, an ample and complete enjoyment of an adequate remedy.

But if a new trial were granted to the defendant, of questions which have been correctly tried and rightly decided, that would be an exercise of arbitrary power of which the plaintiff and the public would have reason to complain. Such an unnecessary new trial

would be an unnecessary expense and burden to the plaintiff and the public. And if public rights are to be disregarded, and the rights of the parties alone are considered, it must be remembered that the party who has obtained a verdict, has rights as well as the other party. Upon general principles, the plaintiff in this case, has as clear a right to the verdict upon the questions that were rightly tried, as the defendant has to a new trial of the question that was wrongly tried. And when the defendant asks the court to deprive the plaintiff of the ground fairly and legally won, and to put the plaintiff to another expensive, laborious and vexatious campaign to recover the same ground a second time, it is for the defendant to show how such an extraordinary, unjust, and unconscionable demand can be sustained. On the face of it, such a demand is an appeal to despotic force. A power that would indulge itself in the needless and indiscriminate destruction of those parts of a costly verdict in which there is no error, can be paralleled only by a power that would destroy an entire verdict without cause. If the whole of the verdict in this case, were destroyed when nearly the whole of it is right, the plaintiff might be excused for reprehending a discretion stretched into arbitrary power, and calling for a restriction of it within reasonable limits.

The maxim which, taken literally, requires courts to follow decided cases, is shown by the thousands of overruled decisions, to be a figurative expression requiring only a reasonable respect for decided cases. There is no New Hampshire decision of the question now under consideration. The weight of the decisions in other jurisdictions taken together, preponderates decidedly in favor of a new trial of so much of a case only as is necessary to be retried in order to correct the errors of the former trial. And if only those decisions are regarded, the reasoning and grounds of which are applicable to, and consistent with, our general system of remedial law, the authority of decided cases, is much more in favor of the same conclusion.

In New Hampshire, a new trial has uniformly been of the whole case. And this practice has been the expression and operation of the common opinion that a new trial could not be of part of a case. The question then arises, what is the weight of common opinion as legal authority. On that question we have the judgment of Chief Justice Denman, delivered in *O'Connell* v. *Regina,* 11 Cl. & Fin. 365-388, in the House of Lords, in 1844. " I quite agree," said he, " with Mr. Baron Parke, as to the general opinion which has prevailed in the profession upon this point. He and Mr. Justice Coltman have both stated the existence of that opinion as a fact upon which no doubt can be entertained. I felt, as my learned brother did, great surprise when I heard that most able and ingenious argument which was addressed to the house, and I confess that I had never felt a doubt upon the subject until that argument was submitted to my mind. But I must add that I never had occasion to give a judicial or a professional consideration to the matter. And I must

ask, when such an argument is raised, what is the duty of a Court of Error? To consider whether the doubt is well founded or not. Not to be run away with by mere authority, unless indeed it is so decisive as to get rid of the doubt; but to see whether in point of law there is legal ground for the doubt which is entertained. My lords, this is no unusual practice." He then referred to a case in the court of exchequer, in which "it was proposed to overrule, not the *dicta,* the impressions, the fancies of the learned frequenters of Westminster Hall, but decided cases, running through a period of near fifty years, appearing in numerous reports, and laid down by all the text writers. I believe Mr. Justice Bayley, on a particular examination of those cases, thought them clearly founded in error; they were traced to a *dictum* uttered by Lord Mansfield in his first judicial year, which *dictum* was held by Mr. Justice Bayley to be untenable; and my noble and learned friend (Lord Lyndhurst) pronounced the unanimous judgment of his court, denying the authority of these cases, and overruling them all."

After referring to a similar course taken in *Queen* v. *Millis,* 10 Cl. & Fin. 534, Lord Denman continued: "Now, my lords, after that proceeding, which indeed followed many precedents, are we not bound to make a full examination of the grounds and reasons upon which the judges may have founded the opinion which we asked at their hands? Having done so in this case, I must venture to say that my surprise has changed its object. I no longer wonder that the objection should have been taken to the supposed law, but that such should have been supposed to be the law. I am convinced that it never has been the law. *     *     *     *     *     This whole doctrine has arisen upon a single remark of Lord Mansfield, twice repeated. *     *     * It is clear that this opinion (of Lord Mansfield) taken up in general terms, has engendered the notion which has been universally prevalent in Westminster Hall. Several judges, and many barristers and persons in high situations, have expressed the same opinion in the same general terms, and they have taken for granted that it might be truly so stated. And I am tempted to take this opportunity of observing, that a large portion of that legal opinion which has passed current for law, falls with the description of ' law taken for granted.' If a statistical table of legal propositions should be drawn out, and the first column headed ' law by statute,' and the second ' law by decision '; a third column, under the heading of ' law taken for granted,' would comprise as much matter as both the others combined. But when, in pursuit of truth, we are obliged to investigate the grounds of the law, it is plain, and has often been proved by recent experience, that the mere statement and restatement of a doctrine,—the mere repetition of the *cantilena* of lawyers,—cannot make it law, unless it can be traced to some competent authority, and if it be irreconcilable to some clear legal principle."

If we adopt Lord Denman's estimate of common opinion, we must

hold that a new trial can be of a part of a case; for the common opinion to the contrary, cannot be traced to any competent authority, and is irreconcilable to the clear legal principle of correcting errors by destroying no more than is practically necessary. And it is settled by the authority of New Hampshire decisions, that Lord Denman's estimate of the weight of common opinion, is the rule in this state. When we recall the inestimable labors of Chief Justice Smith, who found the law of New Hampshire, in practice and administration, a chaos, and who left it comparatively an organized and scientific system, we cannot doubt that if the question now presented to us, had been pointedly propounded to that great jurist, he would have settled it upon principle rather than upon the prevailing opinion of his day. And when we recall the series of leading cases, revolutionary in precedent but conservative in principle, like *Britton* v. *Turner*, 6 N. H. 481; *Pierce* v. *State*, 13 N. H. 536 (on the point of juries not being judges of the law in criminal cases), *Berry* v. *Osborn*, 28 N. H. 279; *State* v. *Barllett*, 43 N. H. 224; *Bassett* v. *S. M. Co.*, 43 N. H. 569; *State* v. *Squires*, 48 N. H. 364, and many others, in which the example of Chief Justice Smith has been followed to the present time, our course is cleared of all difficulty.

In *King* v. *Stone*, 1 East 648, (in 1801,) counsel, in argument, having cited a certain decision, Lord Kenyon, premising that the decision followed a precedent in Burn's Justice, said, "I am very sorry that that was ever acquiesced in by me. I have often thought since, that there is sound sense in what was once said by the late Lord C. J. Eyre, that the sooner a bad precedent was gotten rid of the better." That observation of Lord Kenyon exhibits the spirit that has generally prevailed in New Hampshire law. *Hall* v. *Chaffee*, 14 N. H. 227, 228; *Tenney* v. *Lumber Co.*, 43 N. H. 351. And his remark in *Wilson* v. *Rastall*, 4 T. R. 757, (in 1792,) that "the practice of the court forms the law of the court," applies, in this case, to the controlling New Hampshire practice of adhering to indisputable legal principle, rather than a common opinion adopted and inherited without investigation, when (as in this case) the restoration of sound principle to its rightful place, will not have a restropective and unjust effect upon titles and rights founded on the common opinion.

We find that the correction of errors by a new trial of so much of the case only as must be retried in order to fairly correct the errors, is consistent with established legal principles; that the system of legal remedies is incomplete and incongruous without it; and that it is sufficiently supported by authority. We find that it is so plainly a reasonable, convenient, just and necessary application of a familiar and elementary rule, that it must be regarded as having been, from the beginnig, a part of the common law which, "in process of time," has gradually "received a greater perfection, not by the change of the common law, as some have thought," but by the performance of the judicial duty of rectifying "the mistakes of former ages," (1 Hale P. C. 24,)—a duty which we are not at liberty to neglect, and

in the discharge of which it is a great satisfaction to know that our mistakes can be corrected by our successors.

In accordance with these views, the verdict is not now set aside, but a new trial is granted of the question in the former trial of which there was error. The justice presiding at the new trial, will determine how much of the case it is necessary to try in order to correct that error. If the defendant does not desire this new trial, there will be judgment on the verdict.